■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. JULIO RAY-MOND LEBRON, Appellant.— Appeal by defendant from a judgment of the Supreme Court, Queens County, rendered July 18, 1972, convicting him of

murder and attempted robbery in the first degree, upon a jury verdict, and imposing sentence. The appeal also brings up for review the denial, after a hearing, of defendant's pretrial motions to suppress identification testimony and statements made by him while in police custody. Judgment reversed, on the law and the facts, new trial ordered, and motions to suppress granted in part and denied in part, as indicated hereinbelow. Defendant was arrested by the police as a suspect in the stabbing death of one Michael R. Burns and the alleged robbery of one Carol Novello, which occurred at St. Nicholas and Gates Avenues, in Queens. At the combined *Wade* and *Huntley* hearing it developed that when he was brought to the police station 11 days after the incident and given his *Miranda* warnings he agreed to make a statement. The District Attorney's office was then called and an Assistant District Attorney left for the police station. In the interim, defendant agreed to participate in a line-up. Defendant, who is Puerto Rican, stood with four other men, all of whom were white, and who, from photographic evidence, were readily distinguishable from him. He had been described to the police as a male Puerto Rican called Ray, who was about 5 feet, 8 or 10 inches tall, well-built, stocky, with short-cropped or crew-cut hair. He allegedly wore a hat at the time of the crime. None of the other members of the line-up closely resembled him and no hats were made available. The line-up was viewed by Carol Novello (the victim of the alleged robbery) and Fred Liantonio, a purported eyewitness. Liantonio's testimony was, essentially, that he came across the deceased, Burns, whom he knew, and saw him standing on a corner, holding his chest, which was bleeding. Burns told Liantonio to help Novello, whom Liantonio also knew, and that someone was trying to get her money. When Burns spoke to him, Liantonio noticed that Novello was across the street, at a distance of about 18 feet. Someone was behind her, with his right arm around her neck, holding a knife to her neck and chest. He identified that person as defendant. He gave chase, but never got closer than 10 to 15 feet from the perpetrator. Liantonio admitted that at the time of the incident he was a drug addict, using two $4 bags a day and that he had injected himself with heroin about six hours earlier. Carol Novello (who, it developed at the trial, was also a drug addict) walked with the perpetrator a short distance before he attacked her with the knife. She managed to get free, after Liantonio started to chase him. A few days after the incident, both Novello and Liantonio were shown various mug shots, which included a photograph of defendant taken four years earlier, where his appearance, at least with respect to his hair length, was markedly different from his appearance at the time of this incident. Liantonio picked defendant's mug shot out of an array of at least eight others. Novello, however, could not make any identification. At the line-up, which took place about a week later, Liantonio made a positive identification of defendant, although Novello, who had had a better opportunity to observe the perpetrator, could only say that defendant looked like the man but could not positively identify him. They had both been told by a police officer that Ray was in custody and that they were to pick him out of a line-up. In addition, Liantonio was told that the person whom the police had in custody matched the description of the perpetrator which he had given the police and also matched the photograph he had selected. This is precisely the kind of police practice condemned in *People* v. *Rahming* (26 N Y 2d 411, 416) and *People* v. *Cooper* (31 A D 2d 814, app. dsmd. 25 N Y 2d 928) and which, prima facie, rendered the line-up vulnerable to suggestion (*People* v. *Rahming, supra*). Our viewing of the photographs of the line-up reveals that, except for defendant, the other participants had obviously been hastily selected. Only one other might possibly have fit the

description given by Liantonio as the man he had seen holding the knife to Novello and whom he had chased. Moreover, although Liantonio described the man as wearing a hat, none of the men in the photographs were wearing hats. Thus the line-up, which contained only one Puerto Rican, defendant, was unduly suggestive (see, e.g., *People* v. *Burwell*, 26 N Y 2d 331), especially when viewed by persons who had been told that the individual they had described to the police was in the line-up. In view of our conclusion that the pretrial identification procedures were unnecessarily suggestive and conducive to possible irreparable mistaken identification, it "became incumbent upon the People to establish by clear and convincing evidence that the identification was based upon visual observation" by Liantonio at the time of the incident (*People* v. *Toro*, 44 A D 2d 848; *People* v. *Logan*, 25 N Y 2d 184; *People* v. *Ballott*, 20 N Y 2d 600; *People* v. *Velez*, 43 A D 2d 745, 746). This, on the record, we find the People failed to do. The denial of the motion to suppress Liantonio's identification testimony was, therefore, error. After the line-up and after defendant was permitted to make a telephone call to his home, he changed his mind and decided not to make any statement. He also mentioned that he might be getting an attorney from the Legal Aid Society. When the Assistant District Attorney later arrived, he was informed of defendant's changed decision. The Assistant nevertheless again advised defendant of his *Miranda* rights, but defendant again refused to make a statement. Defendant was then taken to the Kew Gardens courthouse to be arraigned. He was alone in one automobile with a police detective. The Assistant District Attorney followed in another car, with another detective. On the way to the courthouse, defendant and the detective with him engaged in a conversation, which, as described by the detective, was as follows: "During the course of the transportation Lebron stated to me. 'Are you guys trying to pin this thing on me?' So I said, 'Nobody's trying to pin anything on anybody, but the word in the street is that you did the stabbing.' So he says, 'I didn't. Mario [a codefendant indicted together with defendant] did the stabbing;' and I told him that if that's the truth then tell it to the District Attorney, at which time he stated, 'Yeah, well, I want to make a statement'." After arriving at the courthouse, the Assistant District Attorney was informed that defendant wished to make a statement at that time. He again gave defendant his warnings and obtained a confession from him. This confession was handwritten by the Assistant District Attorney and was later typewritten by one of the detectives. It was never signed by defendant, nor does it appear from the record that it was ever read to, or by defendant, or that he ever orally acknowledged it. We need not decide whether the second part of the statement, which came as the result of prodding from an experienced police detective who was undoubtedly familiar with the felony-murder rule, constituted deceptive legal advice, which clearly threatened defendant's privilege against self incrimination and would call into question the voluntariness of the confession obtained thereby, since, in any event, the entire statement given to the Assistant District Attorney was improperly received in evidence. It was handwritten by the Assistant District Attorney, was never signed or orally acknowledged by defendant and was not read to, or by, him (*People* v. *Kenny*, 20 A D 2d 578, 579; *People* v. *Duffy*, 23 A D 2d 699). We conclude that the denial of the motion to suppress defendant's oral statement made in the car was proper. Finally, we deem it error for the trial court to have permitted the prosecution, as part of its direct case, to allow a medical expert to testify as to the effects of heroin on the human body and as to whether it would alter the user's perception. It is clear that, despite the stated purpose of the prosecutor, his true purpose was to have the medical expert bolster the identification testimony of

Liantonio and Novello, both of whom were drug addicts at the time of the incident herein. Such a tactic is clearly improper (*People* v. *Williams*, 6 N Y 2d 18, 26, cert. den. 361 U. S. 920; *People* v. *Bartholomew*, 73 Misc 2d 541, 544), as it tends to invade the province of the jury (*People* v. *Graydon*, 43 \ D 2d 842). Shapiro, Acting P. J., Cohalan, Christ, Brennan and Benjamin, JJ., concur.