# (January 13, 1981)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GEORGE WILLIAMS, Appellant. — Judgment, Supreme Court, Bronx County, rendered February 28, 1979, convicting defendant of criminal sale of a controlled substance, third degree, and which judgment resentenced him *nunc pro tunc* on March 12, 1980 to a term of three to nine years, reversed, on the law and the facts, the motion to suppress granted, and the indictment dismissed. An undercover policeman, equipped with a hidden transmitter, entered a social club and, for $50, purchased cocaine from a man in the front room. He left the club and radioed his backup team. Because the transmission was garbled, they understood only that he had made a buy. The sergeant in charge ordered the team to enter the club and secure it so that no one could leave. He then went down the street to meet the undercover who described the seller: a bearded black male, 30 years old, medium build, wearing a tan cap, brown leather jacket, glasses, white sneakers, dungarees, and a large silver bracelet. The sergeant entered the club, found six or eight persons in the front room, but none of them fit the description. They were released. In the back room were 20 to 35 people shooting craps. (The defendant claims he was the banker of the game and thus handled all of the wagered money.) The players were made to walk in single file past the sergeant. The defendant was held because he "fit the description a hundred percent". But, belying certainty, the sergeant also held three or four others because they "partially fit the description". He had all of them frisked for weapons. Then, obviously to pinpoint the drug seller among the suspects, the sergeant asked which of them had any money. When the defendant and another acknowledged they had, the sergeant said, "Let me have it". The defendant handed over $101, included in which were the marked $50 the undercover had used in the purchase. The defendant was told he was under arrest and the others were released. The defendant was taken by police car to the station where the undercover looked at him through a one-way mirror. He said that "he thought it was him, but he was not sure". The sergeant said "If you are not a hundred percent sure it's him, then I'm going to release him". Again, the undercover responded that "he could not be a hundred percent sure at that time". While the process to release the defendant was going on, a cap

and glasses found in the transporting car were placed on him. After that the sergeant told the undercover that the defendant "fits the description. He has the bracelet. He has the beard, the cap. He has the glasses and he has the jacket. *He has the money"* (emphasis supplied). The undercover then identified the defendant as the drug seller. The defendant's motion to suppress the money taken from him should have been granted. The demand of the police that the four or five suspects held at the social club produce their money and turn it over exceeded the self-protective margin for intrusion fixed by *Terry v Ohio* (392 US 1) and its progeny, and constituted an unlawful search. Knowledge of the police that a crime has been committed could afford no basis for this search, lacking probable cause that the person searched committed the crime *(Brinegar v United States,* 338 US 160). By holding all four or five and demanding their money, the sergeant clearly indicated that he had no probable cause to believe any particular one was the drug seller. At best, they were all merely under suspicion. By searching the defendant in the absence of probable cause particularized as to him, the police exceeded permissible constitutional limits *(Ybarra v Illinois,* 444 US 85). The *Wade* motion should likewise have been granted and the indictment dismissed. Although the undercover was within arm's length of the seller during the purchase, he was, soon afterward and more than once, unable to identify the defendant as the one who had sold the drug. His identification came only after he had been told by the sergeant that the purchase money had been found on him, a fact totally unrelated to the defendant's appearance. An identification obtained by telling a witness some fact to establish that the subject is indeed the perpetrator is unreliable and should be suppressed *(People v Ames,* 49 AD2d 514; *People v Lebron,* 46 AD2d 776). Understandably, on the evidence presented, the hearing court did not find that the undercover could identify the defendant at the trial by depending solely upon his observations of him at the social club. Rather, while acknowledging that the identification "seems suggestive", it improperly left the entire identification question to the jury (see *People v Ghee,* 42 AD2d 860). No point is served by remanding for findings. The "totality of the circumstances" *(Stovall v Denno,* 388 US 293, 302) — the undercover's reiterated uncertainty immediately after his observation at the club transmuted to certainty by the sergeant's improper disclosure — does not meet the People's burden of proof by clear and convincing evidence *(People v Ballott,* 20 NY2d 600, 606, 607) and vitiates any in-court identification. Concur — Murphy, P. J., Ross, Markewich and Lynch, JJ.

Lupiano, J., dissents in a memorandum as follows: The statement of facts by the majority is fairly presented. However, I disagree with the majority's conclusion, both on the issue of suppression of the money which defendant handed over to the police, and on the issue of the *Wade* motion. "In evaluating the police action we must consider whether or not it was justified in its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible *(People v Cantor,* 36 NY2d 106, 111). We bear in mind that any inquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions. By this approach various intensities of police action are justifiable as the precipitating and attendant factors increase in weight and competence. The minimal intrusion of approaching to request information is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality *(People v De Bour* * * *). The next degree, the common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary

to gain explanatory information, but short of a forcible seizure *(People v Cantor,* 36 NY2d, at p 114, *supra; People v Rosemond,* 26 NY2d 101; *People v Rivera,* 14 NY2d 441, 446, and authorities cited therein). Where a police officer entertains a *reasonable suspicion* that a particular person has committed, is committing or is about to commit a felony or misdemeanor, the CPL authorizes a forcible stop and detention of that person (CPL 140.50, subd 1; see *Terry v Ohio,* 392 US 1; *People v Cantor, supra)" (People v De Bour,* 40 NY2d 210, 222-223; emphasis supplied). Under the circumstances herein, it was entirely reasonable for the police to detain those few of the occupants of the club who most closely matched the *detailed* description given by the undercover police officer of the man who sold him cocaine for $50 at the social club. The commonsense reasonableness of the police conduct in temporarily detaining these four or five individuals (including defendant) was highlighted by the fact that while defendant was the only one among them who completely matched the detailed description given by the undercover officer, the others also matched the description in varying degrees. The inquiry by the sergeant as to which of them had any money (the narcotic transaction having involved marked money) is clearly embraced within the right of the police to require an explanation of their conduct. Parenthetically, these individuals were all initially observed by the police partaking in a large "crap game" which participation may well have involved an offense under article 225 of the Penal Law entitled "Gambling Offenses." In this connection, note is also taken of section 225.05 of the Penal Law which provides: "A person is guilty of promoting gambling in the second degree [a class A misdemeanor] when he knowingly advances or profits from unlawful gambling activity." Defendant and another in this group of some four or five individuals detained by the police admitted that they possessed money, and complied with the request of the sergeant to let him examine their money. Possession of the marked money would, of course, be another factor in the focusing of probable cause in the dynamic of this encounter between the citizenry and the police. Of some relevance, the possession of money might be indicative of involvement in the gambling operation as other than a mere "player." (Indeed, as aptly noted by the majority, defendant admits that he was more than a mere "player," to wit, that he was the "banker" of the "crap game.") The money ($101) voluntarily handed over by the defendant to the police (he was not physically subjected to a search for same) contained the entire marked $50 the undercover officer had used in the purchase. Thus probable cause to arrest the defendant was presented and he was arrested; the others being released. Further, the conduct by the police herein did not violate the margin for legitimate police intrusion fixed by *Terry v Ohio* (392 US 1). The Supreme Court stated (pp 13-15) therein that "The exclusionary rule has its limitations * * * as a tool of judicial control. It cannot properly be invoked to exclude the products of legitimate police investigative techniques on the ground that much conduct which is closely similar involves unwarranted intrusions upon constitutional protections. * * * Nothing we say today is to be taken as indicating approval of police conduct outside the legitimate investigative sphere." The circumstances in the case presently before us disclose legitimate police investigative techniques within the legitimate investigative sphere. "It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained" (3 La Fave, Search and Seizure, § 9.2, p 36). Indeed, in *People v Cunningham* (50 AD2d 69, 71), the defendant "complied with the three statutory requirements of name, address and *explanation,* even

*to the extent of displaying the items in the bag he was carrying"*, i.e., the investigative technique employed consisted of a request to the suspect that he, in effect, consent to a *limited* search. Patently, the voluntary compliance by defendant herein with the police request to hand over the money in his possession for their inspection amounted to a request of and permission by the defendant to a limited search. Similarly, in *United States v Collins* (532 F2d 79), the Federal appellate court in distinguishing between an investigative stop and an arrest, viewed a request for a limited search, not extensive or exploratory in scope, which request was complied with by the defendant who was the subject of the investigative stop, as proper, there being no police harassment involved. It has been noted that "The permissible purposes of a *Terry* stop include determining the detainee's identity, *Adams v. Williams,* 407 U.S. at 146, 92 S.Ct. 1921, maintaining the status quo temporarily, *id.,* asking the detainee to explain the suspicious circumstances, *United States v. Brignoni-Ponce,* 422 U.S. at 881-82, 95 S.Ct. 2574, and general investigation and interrogation, *United States v. Oates,* 560 F.2d at 57 & 59" *(United States v Smith,* 574 F2d 882, 886, n 15). In *United States v Smith (supra),* after properly initiating a *Terry* stop of the defendant who was reasonably suspected of carrying narcotics, the Drug Enforcement Agency's agent asked the defendant for permission to search her purse, and she consented. The request was held to be within the range of permissible action. "It is now axiomatic that a law enforcement officer has the power, indeed the obligation, to detain a person temporarily for the purpose of interrogating him if the officer reasonably suspects that the detainee has committed or is about to commit a crime. * * * To establish the constitutionality of the stop, however, the 'officer [must be able to] point to specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant that intrusion.' * * * Obviously, if the offense is minor and there is substantial uncertainty that the detainee is involved, only a minimally intrusive stop would be proper. On the other hand, when the police officer knows or suspects that an offense with serious societal consequences is being committed and there is some reasonable possibility that the person he detains is involved, a more substantial detention is justified" *(United States v Oates,* 560 F2d 45, 58-59). Under the circumstances herein the investigative stop of the defendant was justified at its inception based on the police knowledge at the time of the stop. Further, the scope of the stop was reasonable under *all* the circumstances. As aptly noted in *United States v Collins (supra,* p 83), citing *United States v Wickizer* (465 F2d 1154, 1156): "Balancing the need for further investigation, *notwithstanding the lack of probable cause,* and objectively viewing all the existing circumstances, we find the limited intrusion permissible. Simply because the initial questioning might well give the appearance that 'all is well', if an officer has a justifiable basis for the initial intrusion, he may take whatever additional action which would 'warrant a man of reasonable caution' under the circumstances to take." (Emphasis supplied.) Apart from the foregoing analysis which treats of the investigative stop nature of the initial detention of defendant predicated on a reasonable suspicion standard, the circumstances demonstrate that probable cause existed for the arrest of the defendant at the outset, in that he was at all times the only occupant of the premises who matched the detailed description given by the undercover officer in all its particulars. This circumstance, coupled with all the other circumstances, warranted the police as prudent men in *believing* that the offense had been committed (see *People v Oden,* 36 NY2d 382, 384). "In dealing with probable cause * * * as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and

prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved" *(Brinegar v United States,* 338 US 160, 175). The detailed description obtained by Sergeant Colavito from the undercover officer respecting the individual from whom that officer had just purchased the narcotics, is as follows: male black, 30 years old, medium build, wearing a baseball-type tan cap, glasses, silver bracelet, brown leather jacket, white sneakers, dungarees and a beard. As defendant was the only one at the social club when the backup team entered who matched this detailed description 100%, probable cause existed for his arrest. However, Sergeant Colavito, the officer in charge, took reasonable and proper investigative steps to further enhance the probabilities and being aware that "marked" money was utilized in the "buy," singled out not only defendant, but the two or three others in the crowd who conformed in varying degrees to the detailed description alluded to above. The commonsense and reasonable investigative process thus employed by the police herein is viewed by the majority not in a positive, but in a pejorative sense, i.e., as a basis for concluding that "By holding all four or five and demanding their money, the sergeant clearly indicated that he had no probable cause to believe any particular one was the drug seller." Such conclusory inference from the fact that the police initially detained three or four others in addition to the defendant does not necessarily follow. Further, while it may be argued that the police do not have probable cause to arrest one of two or more persons in the suspect class until the information singles out one individual (which is exactly the situation herein in that the information — the detailed description of the undercover officer — singled out the defendant) (see *Wong Sun v United States,* 371 US 471; *Mallory v United States,* 354 US 449; *Johnson v United States,* 333 US 10), there is authority that while probable cause requires a narrowing down or focusing in the number of suspects, it does not under all circumstances require a focusing upon one suspect (see *State v Jordan,* 36 Ore App 45, upholding the arrest of two women at a house when the police went to arrest a single female robbery suspect; see, also, *Commonwealth v Richards,* 458 Pa 455, which stands for the proposition, *inter alia,* that probable cause requires a fair, not an absolute, degree of selectivity). Regarding the aspect of multiple arrests for probable cause, the Court of Appeals of Oregon observed in *State v Jordan (supra,* pp 48-49): "The underlying assumption of defendant's theory is that probable cause is finite and, if it is expended on one suspect, there cannot be enough left for another suspect. That theory is no more tenable than would be its opposite: that with probable cause, as with love, there is always plenty for everybody. The statement of the principle most harmonious with the fundamental predicate of the Fourth Amendment, reasonableness, fits between those two extremes. Probable cause may justify the arrest of more than one person. If, for example, a policeman sees A and B bending over a dead man and each accuses the other of killing the victim, there is probable cause for the arrest of either or both and the arrest of A does not preclude the arrest of B. Similarly, if A is found one block north of a recently robbed bank and matches the description of the robber, the arrest of A does not preclude the subsequent arrest of B who also matches the description and is found one block south of the bank. In either case, it would be reasonable for the police to arrest both A and B on probable cause even though they believe that only one of them committed the crime. The purpose of the arrest, however, is not the traditional and statutory purpose of an arrest: to charge the arrestee with crime. Rather, it is to initiate a short-term process of sorting out, usually on the scene, to determine which person should be charged with crime, *i.e.,* arrested in the full sense of the word * * * Although multiple arrests may be reasonable in certain circumstances, the

law does not allow dragnet arrests of many suspects for investigation of each. Factors to separate the reasonable from the unreasonable have been well stated elsewhere: 'Other factors may be important in determining the validity of multiple arrests in a given situation. The degree of certainty that the actual offender is within the group would seem relevant, along with the size of the group. The seriousness of the offenses may affect the result. Also of importance is the need for immediate action, as where two persons of unknown identity are running from the scene of a crime. The available means of post arrest selection may also be a deciding factor. For example, the arrest of these suspects to enable a witness to view them in a lineup may be less objectionable than the arrest of the same number for interrogation....' (Footnotes omitted.) W. La Fave, Arrest, 262 (1975)." It suffices to conclude the foregoing analysis with the declaration that while I conclude on this record that the police conduct herein was fully justified by reasonable suspicion and constituted a "stop," and common-law inquiry with the consequent investigative techniques being within the proper and reasonable scope of such "stop" and inquiry, the defendant, in any event, has no complaint, even assuming the detention constituted a full blown "arrest" because of the presence of probable cause. Concerning the defendant's *Wade* motion, the conclusion by the majority that it should be granted is perplexing. After being arrested for the criminal narcotic sale, defendant entered a police car and the baseball-type hat and glasses he was wearing at the time of his seizure were placed in the rear of the vehicle. At the station house, defendant was placed in a viewing room, i.e., it contained a one-way window. The undercover officer viewed the defendant and observed that his hair was "unruly." At the time when the officer had purchased the narcotic from the defendant some 30 minutes before this viewing, defendant was wearing a hat which gave the appearance that his hair was "flat." Noting that "there was things missing", the undercover officer expressed some hesitancy in positively identifying defendant. He informed Sergeant Colavito of his hesitation — "Gee, it really looks like him, but I don't know. It's something I'm not sure" and inquired as to "what happened to the hat and glasses." The officer reflected that the defendant "was missing two essential items [he] needed to make a positive I.D." Sergeant Colavito informed the undercover officer that the defendant had the "marked" buy money but the undercover officer reiterated that he "still wasn't a hundred percent sure that [defendant] was the subject." Sergeant Colavito recalling that the defendant's hat and eyeglasses were in the police vehicle, directed their return to the defendant. Some five minutes later, the hat and glasses being returned and placed on defendant, the undercover officer instantly and unequivocally identified defendant as the party from whom he purchased the narcotic. As the United States Supreme Court declared in *Manson v Brathwaite* (432 US 98, 114): "reliability is the linchpin in determining the admissibility of identification testimony * * * The factors to be considered are set out in *Biggers,* 409 U.S., at 199-200. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the identification, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." An analysis of these factors as pertaining to the undercover officer's identification of defendant mandates the conclusion that the identification was reliable, and there is not a substantial likelihood of misidentification. With respect to the opportunity to view, the undercover officer purchased the narcotic from defendant while the two were standing side by side by a pinball machine in a room with "very good lighting." Initially, the

officer had an unobstructed side view of defendant's face, and when the defendant spooned out the cocaine and handed it over to the officer, the latter obtained a full view of the former's face at a distance described by the officer as "Almost touching elbows." The undercover officer had defendant in view for approximately three minutes and was standing next to defendant for two and one half of those three minutes. Regarding the officer's degree of attention, it is important to note that he was not a casual or passing observer, but a trained police officer on a specialized and dangerous duty. The undercover officer "was not the ordinary witness to a crime. His participation was deliberate and planned. It was his job. He was trained and experienced for precisely such a role. His objective was the detection of criminal activity and the apprehension and conviction of the perpetrator. He could be expected to make careful observations of the appearance and activities of the suspect, focused all the more by the consciousness of his future need to make a detailed in-court identification" *(People v Morales,* 37 NY2d 262, 271; see, also, *Manson v Brathwaite, supra).* Regarding the accuracy of the description, it is beyond cavil that the undercover officer gave a most detailed description of defendant to Sergeant Colavito within minutes of the narcotic transaction. No real claim has been made that defendant did not conform to, did not possess the characteristics of that description. Pertaining to the undercover officer's level of certainty, his initial hesitation in positively identifying defendant was understandable in view of his apprehension that the defendant was missing "something." Once the hat and dark-tinted glasses were placed on defendant, the undercover officer unhesitatingly and unequivocally identified the defendant. Note is taken of the propriety of compelling the defendant to conform his appearance at the confrontation to his appearance at the time of the crime (see *People v Cwikla,* 46 NY2d 434, 442-444). The time between the crime and the confrontation was some 30 minutes, and the detailed description itself was given by the undercover officer within a few minutes of the crime. Against the weight of the aforesaid is balanced the degree of suggestibility in the identification process. Such suggestibility is at most minimal under the circumstances herein, assuming it is present. While Sergeant Colavito informed the undercover officer that defendant matched the description and had the "buy" money, it is clear that this did not induce the undercover officer to identify defendant. We are dealing here with a trained, experienced undercover police officer whose conduct throughout the identification process is not precipitate, but reflects a reasoned and judicious approach. As the undercover officer is a trained professional he was less likely than a civilian witness to be influenced by any suggestive identification procedure (see *Manson v Brathwaite, supra,* p 115). Further, no undue pressure was brought by his fellow officers to impel his making a positive identification of defendant. Indeed, the undercover officer's initial hesitancy in identifying the defendant, viewed in light of the total circumstances, does not impugn, but gives credence to his powers of observation (especially in light of the defendant's changed appearance at the confrontation). Having concluded that under all the circumstances of this case there is not a very substantial likelihood of irreparable misidentification (a legal question), the trial court was correct in submitting the evidence of identification (or misidentification) to the jury to weigh. As aptly stated by the United States Supreme Court: "Short of that point [a very substantial likelihood of irreparable misidentification *(Simmons v United States,* 390 US 377, 384)], such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification

testimony that has some questionable feature" *(Manson v Brathwaite, supra,* p 116). Accordingly, the judgment of the Supreme Court, Bronx County, rendered February 28, 1979, convicting defendant of criminal sale of a controlled substance in the third degree should be affirmed.