477 A.2d 1372

**COMMONWEALTH of Pennsylvania**

v.

**Daniel Valdez BUNCH, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 13, 1983.

Filed May 25, 1984.

104

M. Douglas Eisler, Assistant Public Defender, West Chester, for appellant.

Stuart Suss, Assistant District Attorney, West Chester, for Commonwealth, appellee.

Before SPAETH, President Judge, and CIRILLO and JOHNSON, JJ.

SPAETH, President Judge:

This is an appeal from judgment of sentence. Appellant was found guilty of robbery, aggravated assault, two counts of firearms violations, criminal attempt theft, and two counts of criminal conspiracy, and was sentenced to a total of six to twelve years imprisonment. We affirm.

The trial court accurately recited the pertinent facts as follows:

On Monday, July 11, 1977, at approximately 3:50 p.m., two (2) black males entered the insurance office of Mr. Leebert Logan located at 1204 Paoli Pike, West Goshen Township, Chester County, Pennsylvania. (N.T. 278–279). While one of the pair remained at the door, the other entered the office and inquired about his uncle. (N.T. 281). After being informed that Logan did not know who his uncle was, the two (2) men left the office. (N.T. 281).

At approximately 4:30 p.m., on the same day, two (2) black men entered the insurance office. (N.T. 282). As one man waited in the outer office, the second man entered the inner office, identified himself as Mr. Johnson (N.T. 294) and inquired about automobile insurance coverage. (N.T. 291–292). After discussing insurance matters for approximately ten minutes, the two individuals left the office. (N.T. 295).

The men immediately re-entered the office. (N.T. 295). Johnson (later identified as Henry Bailey) forced Logan's secretary, Mrs. Ellen Pyle, to crawl underneath her desk. (N.T. 297, 350). The second man began hitting Mr. Logan over the head with a small revolver and yelling that he was going to kill him. (N.T. 295–297). Mr. Bailey kicked Logan and jumped on Logan as the second aggressor and Logan struggled over the gun. (N.T. 298).

Mr. Bailey ransacked Mr. Logan's desk and took a bank pouch containing two (2) Five Thousand ($5,000) Dollar checks from his desk. (N.T. 297, 304).

As the two (2) actors fled the premises, they were observed by Mr. Wilfredo Colon, who was entering the outer office. (N.T. 503). Mr. Colon gave a description of the two men and further stated that they were driven from the scene by a third black male in a 1967 brown Ford Ltd., with trim top, two-door hard top bearing a white Pennsylvania temporary tag license number 0588162. (N.T. 503–504).

Mr. Logan was taken to the hospital and received emergency medical attention requiring fifty-one (51) stitches in his face and scalp and the removal of two shattered teeth. (N.T. 505, 305).

The police were called and at approximately 5:00 p.m. of the same day, a description of the individuals and the vehicle was circulated by a general alarm message put out on the police radio. (N.T. 49).

At approximately 8:00 p.m. of the same evening, Pennsylvania State Trooper Glenn J. Flick observed a vehicle travelling south on Pa. Route 100, near the intersection of

Pa. Route 113, matching the broadcast description of the vehicle. (N.T. 51). The trooper followed that vehicle south on Pa. Route 100 at a distance of five (5) car lengths with no intervening vehicles coming between his and the suspect vehicle. (N.T. 57).

The trooper observed four (4) black males in the vehicle. (N.T. 51–52). From his vantage point, the trooper could see movement within the back seat of the car, as if they were either putting or removing something from between their legs. (N.T. 53). The Trooper also saw these people turning around to look at the police car. (N.T. 61–62, 96). When the vehicle stopped at an ARCO station, Trooper Flick ordered the occupants from the car, searched and handcuffed the suspects and held them for an additional period of ten (10) minutes until Detective Stephen E. Boland, Jr., of the West Goshen Township Police arrived at the scene, at which time all four suspects were turned over to the custody of Detective Boland. (N.T. 54–55). Upon investigation by Detective Boland, it was determined that Mr. Al Gordon, one of the four suspects, was innocent of the Logan robbery so he was released. (N.T. 126–128). The remaining suspects, Mr. Henry Bailey, Mr. Danny Bunch [appellant], and Mr. John Sims were arrested and charged with robbery and other offenses in relation to the Logan robbery. (N.T. 129, 145).

Trial Court Op. at 1–3.

–1–

■ Appellant first argues that because several witnesses who testified at trial were unable to positively identify him as one of the participants in the robbery, there was insufficient evidence to support the convictions. However, Bailey, one of appellant's alleged co-conspirators, testified at trial and identified appellant as a participant in the robbery. This identification was unshaken and by itself was sufficient to support the convictions. *See Commonwealth v. Willis*, 276 Pa.Super. 13, 419 A.2d 70 (1980) (accomplice's

identification testimony by itself sufficient to support conviction).

–2–

Appellant next argues that there was insufficient evidence to support the conviction for criminal attempt theft because there was no evidence that the actors in the crime ever exercised control over the bank pouch. After reviewing the briefs and the record, we find that the trial court's opinion adequately disposes of this argument.

–3–

■ Appellant next argues that the trial court abused its discretion in denying his motion in limine to be permitted to testify without subjecting himself to impeachment by his prior criminal convictions. We find that the trial court adequately considered and weighed the factors set forth in *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973), and *Commonwealth v. Roots*, 482 Pa. 33, 393 A.2d 364 (1978), and did not abuse its discretion in denying the motion. In addition to the reasons cited by the trial court in its opinion, we note that the Commonwealth's case rested primarily on the testimony of Bailey. Therefore, if appellant had testified, the primary issue for the jury to resolve would have been one of credibility between Bailey and appellant. The defense had available and used various means in attempting to attack Bailey's credibility. *See, e.g.*, N.T. 646–53 (Bailey had maintained his innocence at preliminary hearing and line-up); N.T. 658–61 (Bailey agreed to testify pursuant to a plea bargain providing for 10 to 36 months imprisonment). In this situation it was particularly important that the Commonwealth be permitted to attack appellant's credibility if he should testify, and the record does not reveal that it had other means available. *Cf. Commonwealth v. Washington*, 274 Pa.Super. 560, 418 A.2d 548 (1980) (no abuse of discretion in allowing impeachment; were two opposite versions of events and defendant's tactic was to attack prosecution's chief witness by accusations of criminal activity and fraudulent activity); *Com-*

*monwealth v. Williams*, 273 Pa.Super. 389, 417 A.2d 704 (1980) (abuse of discretion in allowing impeachment; although credibility was significant issue, crimes were 8 and 10 years old and were for same crime as crime being prosecuted; Commonwealth had testimony of other witnesses); *Commonwealth v. Herman*, 271 Pa.Super. 145, 412 A.2d 617 (1979) (no abuse of discretion in allowing impeachment; Commonwealth's case was close and hinged on testimony of one witness whose testimony was contradicted; appellant had two alibi witnesses); *Commonwealth v. Campbell*, 244 Pa.Super. 505, 368 A.2d 1299 (1976) (no abuse of discretion in allowing impeachment; had defendant testified, sole issue would have been credibility between victim and defendant; defendant had witnesses to occurrences up until time of crime).

–4–

Appellant next argues that the trial court abused its discretion in denying his motion for severance after co-defendant Sims elected to testify against his attorney's advice. After reviewing the briefs and the record, we find that the trial court's opinion adequately disposes of this argument.

–5–

■ Appellant next argues that the trial court erred in refusing to strike testimony concerning Commonwealth Exhibits No. 31 and No. 32. Appellant's argument appears to be that once the trial court ruled, rightly or wrongly, that these exhibits were themselves not admissible, it was error for the court to refuse to strike testimony regarding them. Appellant does not argue that the testimony was irrelevant or otherwise inadmissible, but only that once the exhibits were ruled inadmissible, the court was required, without more, to strike testimony regarding them. This argument is without merit. There was no error unless the testimony was for some reason inadmissible, and appellant does not offer any reason.

–6–

Appellant next argues that the trial court erred in denying his motion to suppress. In this regard appellant argues: (a) that one of the trial court's findings of fact is unsupported by the record; (b) that the trial court erred in admitting hearsay testimony at the suppression hearing; and (c) that the trial court erred in finding that appellant's arrest was based on probable cause.

–a–

■ Appellant argues that the trial court's finding that the radio transmission was based on information given the police by Pyle and Colon was wrong because the record shows that part of the information (age and weight) was supplied by Sharpless and not by Pyle or Colon. As noted by the trial court: "Trooper Flick made the vehicle stop based on that portion of the radio message pertaining to the vehicle description (N.T. 52, 74), provided in detail by Mr. Colon. (N.T. 49–50)." Trial Court Op. at 5. Therefore, even if appellant is correct, the error was harmless, because Trooper Flick remembered and acted, not on the basis of the information on age and weight supplied by Sharpless, but only on the basis of the information supplied by Colon.

–b–

■ Appellant also argues that the trial court erred in admitting the hearsay testimony of Detective Boland at the suppression hearing. Appellant relies on *Commonwealth v. Farris*, 251 Pa.Super. 277, 380 A.2d 486 (1977). The trial court correctly concluded that *Farris* is inapplicable because it involved the admission of hearsay at the trial itself, and not at the suppression hearing. Since a determination of probable cause may properly be based on hearsay, *see e.g., Commonwealth v. Stokes*, 480 Pa. 38, 389 A.2d 74 (1978), the trial court did not err in admitting this testimony.

–c–

Appellant's final argument is that the trial court erred in concluding that Trooper Flick had probable cause when he

110

arrested appellant. The trial court made the following findings of fact:

Numeral One. At approximately 5:30 p.m. on July 11th, 1977 Trooper Glenn Flick of the Pennsylvania State Police, while on duty, in uniform and in a marked Pennsylvania State Police vehicle, received a radio transmission from the Pennsylvania State Police substation at Embreeville, giving the following information:

An armed robbery had been committed in West Goshen Township, Chester County, Pennsylvania. A handgun or handguns had been used. And that the suspects, consisting of three black males, were in a vehicle described as a Ford Sedan, black vinyl over brown, bearing Pennsylvania temporary registration tag number 0588162. A partial clothing description of the black males was also included.

Numeral Two. Approximately three hours later while on patrol at or near the intersection of Route 100 and 113 in Uwchlan Township, in Chester County, Pennsylvania, Trooper Flick observed, traveling south on Route 100, a vehicle of the same description as that described in the earlier radio transmittal, having the specified Pennsylvania white temporary tag number, and containing four black males.

The trooper began to follow the said vehicle as it proceeded south on Route 100, towards the intersection of that route and Route 30 at Exton, Pennsylvania. He followed said vehicle at an average distance of four car lengths throughout said section of Route 100; there being no intervening vehicles between the trooper's vehicle and said Ford Sedan.

During the movement of the car between the intersection with 113 and the intersection of Route 30, Trooper Flick observed the passengers in the right rear and left rear moving their bodies forward. And he also observed, at one time or another, each occupant of the said vehicle, other than the driver, turning and facing the following police car and looking directly at it.

Numeral Three. When the said vehicle got to the Route 30 intersection at Exton, it pulled into the lane to make a left turn. The trooper pulled immediately behind it. The vehicle then completed the turn on the proper signal and pulled into an Arco service station, roughly speaking, at the southeast corner of said intersection.

The trooper pulled the police vehicle immediately behind the Ford, drew his gun, and by use of the loud speaker system on the police vehicle, ordered the occupants of the Ford vehicle to dismount and lie upon the ground. This they did without further order or without any show of resistance.

Within ten minutes other police and police vehicles were on the scene. And the four occupants of the Ford vehicle were handcuffed and subsequently taken to the West Goshen Township Police Department, where one of the occupants, a man who gave the name Gordon, was released.

Numeral Four. The radio transmission which was heard by Trooper Flick, and upon which he acted, was, in fact, supported by probable cause and was, in fact, based upon information given the police by and through a Miss Ellen Pyle—Mrs. Ellen Pyle, the secretary at the office which was the scene of the alleged robbery, who viewed the suspects; and also by a man named Colon, who came upon the scene as the suspects were fleeing the office immediately after the robbery.

This information by Mrs. Pyle and Mr. Colon was in the hands of the County Police Radio room within fifteen minutes after the alleged incident and, in fact, formed the factual basis for the radio transmission which was then retransmitted from the Chester County Police Radio through the Pennsylvania State Police transmission site at Embreeville.

N.T. 557–561.

On the basis of these findings the trial court concluded that appellant was under arrest when Trooper Flick forced him to get out of the car at gunpoint, to lie on the

ground, and to submit to handcuffing and a search. We agree with this conclusion. *See Commonwealth v. Bosurgi*, 411 Pa. 56, 68, 190 A.2d 304, 311, *cert. denied*, 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963) ("An arrest may be accomplished by 'any act that indicates an intention to take [a person] into custody and that subjects him to the actual control and will of the person making the arrest.' " (citation omitted)). *See also Commonwealth v. Farley*, 468 Pa. 487, 364 A.2d 299 (1976) (arrest occurred at least by time defendant was taken to police station); *Commonwealth v. Roscioli*, 240 Pa.Super. 135, 361 A.2d 834 (1976) (arrest occurred when defendant handcuffed); *Commonwealth v. Kloch*, 230 Pa.Super. 563, 327 A.2d 375 (1974) (arrest occurred when defendant placed in troopers' patrol car). *Cf. Commonwealth v. Ferraro*, 237 Pa.Super. 268, 352 A.2d 548 (1975) (fact that officer withdrew service revolver while directing defendant to get out of car did not alone turn investigatory stop into arrest).

The trial court further concluded that Trooper Flick had probable cause to arrest appellant when he ordered him to get out of the car. We also agree with this conclusion, but our analysis is somewhat different from the trial court's.

In its analysis, the trial court assigned no significance to the fact that Trooper Flick saw four men in the car, while the report he was acting on had referred to only three men. If Trooper Flick had observed only three black men in the car as he followed it, we should conclude that he had probable cause to arrest the occupants, and the trial court's analysis would be sufficient. Trooper Flick knew that three black men had committed armed robbery with a gun. He had a detailed description of the car, and he saw the car in the general area in which the robbery had occurred, approximately three and one-half hours after the robbery. As Trooper Flick followed the car he observed the occupants in the back seat of the car leaning forward and moving their shoulders as though they were removing or putting something between their legs. On these facts, Trooper Flick could reasonably have concluded that the

occupants of the car were the robbery suspects. *See Commonwealth v. Rutigliano,* 310 Pa.Super. 364, 456 A.2d 654 (1983) (arresting officer had probable cause to arrest two male occupants of car: knew burglary had been committed; had neighbor's description of vehicle and his observation that car had two male occupants; two hours had elapsed since car was last seen); *Commonwealth v. Jones,* 233 Pa.Super. 461, 335 A.2d 789 (1975) (arresting officer had probable cause to arrest two black male occupants of car; knew crime had taken place; had description of car; knew two black males had been involved in crime; car was stopped one hour after radio broadcast and six blocks from scene of crime).

The difficulty, however, is that Trooper Flick observed not three black men in the car, but four. Nevertheless, we think that on the facts of this case, it was reasonable for Trooper Flick to conclude, as he did, that *some* three of the four occupants of the car—he did not know *which* three— were the robbery suspects, and that he therefore had probable cause to arrest all four, including appellant.[1] In so holding, we recognize that the Commonwealth does not argue, and Trooper Flick did not claim, that there was any basis for believing that all four of the occupants of the car were robbery suspects.

Our analysis starts from the premise that in the circumstances of this case Trooper Flick had probable cause to believe that three of the four men in the car were the

1. Although the radio broadcast that Trooper Flick heard contained descriptions of the robbery suspects, Trooper Flick testified that he did not remember these descriptions and that he made the arrest based solely on the description of the car, believing that three of the four occupants were the robbery suspects and without making any distinctions among the four. Since Trooper Flick did not remember the individual descriptions broadcast, and did not make an arrest on the basis of them, we cannot rely on the descriptions in determining whether Trooper Flick had probable cause to arrest appellant. *Cf. Commonwealth v. Gambit,* 274 Pa.Super. 571, 418 A.2d 554 (1980), *aff'd,* 501 Pa. 453, 462 A.2d 211 (1983) (officers may rely on radio broadcasts in executing a valid arrest, but knowledge of dispatcher and other officers may not be imputed to officer who did not hear broadcast).

114

robbery suspects. As we have just noted, there is no question that the car was the same as that used in the robbery; that it was stopped in the general area in which the robbery had occurred, and approximately three and one-half hours after the robbery; and that the occupants in the rear seat of the car were observed acting suspiciously. While the law requires that probable cause have a fairly narrow focus, thereby precluding, for example, dragnet operations, we do not believe that the focus must in all situations narrow down to a single suspect—here, to a particular three of the four men to the exclusion of the remaining man.

The Supreme Court was faced with a similar situation in *Commonwealth v. Sangricco*, 475 Pa. 179, 379 A.2d 1342 (1977), in which the appellant argued that the warrant in question was issued without probable cause. The appellant argued that because the warrant was issued for both himself and Ms. Girts, the uncertainty as to who shot the victim should have required the magistrate to refuse to issue the warrant. The Court rejected this argument stating: "[W]e believe that the police acted reasonably in suspecting that appellant *or* Ms. Girts may have been involved. We further believe that the police had knowledge of sufficient facts and circumstances to justify obtaining of the search warrant to conduct a neutron activation analysis test on *both* appellant and Ms. Girts." 475 Pa. at 184, 379 A.2d at 1344 (footnote omitted; emphasis added).[2] *Cf. Commonwealth v. Harper,*

2. *See also Filmon v. State,* 336 So.2d 586 (Fla.1976), *cert. denied, app. dismissed,* 430 U.S. 980, 97 S.Ct. 1675, 52 L.Ed.2d 375 (1977) (court rejects argument that conduct of officer at hospital constituted dragnet when all five living victims of two-car accident were given blood alcohol tests; officer had reasonable cause to believe that one or more of limited group of five had been driving under influence of alcohol); *State v. Jordan,* 36 Or.App. 45, 583 P.2d 1161 (1978), *aff'd,* 288 Or. 391, 605 P.2d 646, *cert. denied,* 449 U.S. 846, 101 S.Ct. 132, 66 L.Ed.2d 56 (1980) (police went to house they had probable cause to believe fugitive was living in; defendant answered door and identified herself using alias used by fugitive; police arrested defendant, intending to establish her identity through fingerprints at station; after observing mug shot of fugitive and still unsure he had right person, officer ordered police to go back to house to search for fugitive; officers found real fugitive in attic; search held valid and evidence discovered

248 Pa.Super. 344, 375 A.2d 129 (1977) (officer had probable cause to believe that three perpetrators were on bus, and thus was justified in transporting to hospital for identification by victim six black men who were on bus and fitted description of attackers; heinous nature of the crime and small number of suspects made conduct of police reasonable; fact that innocent men were being detained factor necessitating prompt identification procedure). In discussing the concept of probable cause in *Sangricco* the Court quoted from *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949), in which the United States Supreme Court said:

> These long-prevailing standards [governing probable cause determinations] seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave

in search of house admissible). *But see United States v. Fisher*, 702 F.2d 372, 378 (2d Cir.1983) ("Second, we note that at the hearing Ransford repeatedly mentioned that the Black males on the porch on Saint Louis numbered three or four. If there were four, at least one of them was not one of the robbers. In those circumstances, even if it were known that all three robbers were on the porch, and if Fisher was one of four people on the porch, there would have been no legitimate inference that Fisher was one of the robbers."); *People v. Williams*, 79 A.D.2d 929, 435 N.Y.S.2d 1, *app. dismissed*, 53 N.Y.2d 866, 440 N.Y.S.2d 188, 422 N.E.2d 833 (1981) (officer had description of man, entered club and held four or five men who fit description to varying degrees; search unlawful because no particularized probable cause as to defendant himself).

law-abiding citizens at the mercy of the officers' whim or caprice.

One state court has analyzed this problem as follows: Probable cause may justify the arrest of more than one person. If, for example, a policeman sees A and B bending over a dead man and each accuses the other of killing the victim, there is probable cause for the arrest of either or both and the arrest of A does not preclude the arrest of B. Similarly, if A is found one block north of a recently robbed bank and matches the description of the robber, the arrest of A does not preclude the subsequent arrest of B who also matches the description and is found one block south of the bank.

In either case, it would be reasonable for the police to arrest both A and B on probable cause even though they believe that only one of them committed the crime. The purpose of the arrest, however, is not the traditional and statutory purpose of an arrest: to charge the arrestee with crime. Rather, it is to initiate a short-term process of sorting out, usually on the scene, to determine which person should be charged with crime, *i.e.*, arrested in the full sense of the word. Thus the initial 'arrest' is really in the nature of a stop or detention rather than a true arrest.

Although multiple arrests may be reasonable in certain circumstances, the law does not allow dragnet arrests of many suspects for investigation of each. Factors to separate the reasonable from the unreasonable have been well stated elsewhere:

> "Other factors may be important in determining the validity of multiple arrests in a given situation. The degree of certainty that the actual offender is within the group would seem relevant, along with the size of the group. The seriousness of the offense may affect the result. Also of importance is the need for immediate action, as where two persons of unknown identity are running from the scene of a crime. The available means of postarrest selection may also be a deciding

factor. For example, the arrest of three suspects to enable a witness to view them in a lineup may be less objectionable than the arrest of the same number for interrogation. * * * " (Footnotes omitted) W. La-Fave, Arrest, 262 (1975).

*State v. Jordan,* 36 Or.App. at 49–52, 583 P.2d at 1163–64 (footnotes omitted).

Similarly, a commentator has said: "[I]t is precisely because arrest serves an investigative function that '[t]he quantum of evidence necessary to sustain an arrest is not, in all circumstances, the same quantum necessary to make out probable cause for charging a person with the crime.' " W. LaFave, 1 Search and Seizure § 3.2 at 481 (1978) (footnote and citation omitted). And the commentary to the Model Code of Pre-Arraignment Procedure 295 (Proposed Official Draft, 1975), quotes with approval Restatement (Second) Torts § 119, Comment j, Illustration 2, which is:

A sees B and C bending over a dead man D. B and C each accuse the other of murdering D. A is not sure that either B or C did the killing, but he has a reasonable suspicion that either B or C killed D. A is privileged to arrest either or both.

The Code, at 295 n. 14, does not find this position inconsistent with the United States Supreme Court's decision in *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), because:

In that case officers lawfully present in a hotel lobby detected the odor of burning opium coming from a room. One of the officers knocked and announced his title. Defendant, the sole occupant, opened the door and "acquiescently" admitted the officers, who thereupon arrested her. It was held that since "the Government ... concedes that the arresting officer did not have probable cause to arrest until he had entered her room and found her to be the sole occupant," and since there were no valid grounds to search the room apart from the arrest, the arrest was not legal. *Id.* at 16 [68 S.Ct. at 370]. Since when she first came to the door the defendant may

118

have been one of an indeterminate number of persons within—rather than the sole occupant or one of a very few persons—the Government's concession was appropriate.

Here, the time of the robbery and the manner of its execution, the identity of the car, the area where the car was observed, and the suspicious activity of the occupants in the rear of the car, all focused probable cause onto three of the four occupants of the car as the robbery suspects. While it was likely, as the trooper recognized and in his testimony acknowledged, that one innocent man would be detained, in the circumstances that detention, amounting to arrest, was reasonable.

■ With regard to this conclusion we note that although an initial detention amounting to arrest may be reasonable, continued detention may be unreasonable and therefore illegal. For example, after the arrest the police may uncover or receive additional information showing that they no longer have probable cause to detain the suspect. *See, e.g., People v. Quarles,* 88 Ill.App.3d 340, 43 Ill.Dec. 497, 410 N.E.2d 497 (1980); *Castellano v. State,* 585 P.2d 361 (Okla.Crim.App.1978). Here, the police did receive additional information. However, it confirmed the reasonableness of their belief that appellant had been one of the robbers and, further, undid the probable cause as to the fourth man. *See,* N.T. 120 (Detective Boland testified that upon arriving at the gas station, "One man struck me as being a positive on my message, my description. This was the man in the blue shirt, who turned out to be Danny Bunch. He looked solid."); N.T. 126 (Detective Boland testified that Bailey, Sims and appellant fit Colon's description of the robbers), N.T. 127–29 (police verified Gordon's alibi and released him).

■ We also note that there will of course be cases in which the facts known to the police will be less narrowly focused than in this case and will therefore give rise only to a reasonable suspicion, justifying temporary detention but

not detention amounting to an arrest. *See, e.g., Commonwealth v. Harper, supra.* And in other cases the facts known to the police will be so unfocused as to give rise not even to a reasonable suspicion, so that neither a detention nor an arrest will be justified. *See, e.g., Commonwealth v. Fassett,* 496 Pa. 529, 437 A.2d 1166 (1981) (sole factors motivating stop were light color of vehicle and race of defendant and his companion; arresting officer noted nothing suspicious about vehicle, manner of operation, or its occupants; radio alert stated three or four black males were being sought but appellant's automobile contained two persons; stop more than nine hours after robbery; location of robbery more than eight miles from stop). In every case, however, the determination of probable cause must turn on the particular facts, and in this case we believe that the facts known to Trooper Flick had a sufficiently narrow focus to give rise to probable cause and to justify the arrest of the four occupants of the car.

The judgment of sentence is affirmed.