**PITTSBURGH DIE SINKERS LODGE NO. 50 OF the INTERNATIONAL DIE SINKERS' CONFERENCE, and Harold Johnson, President, and E. C. Baumbeck, Secretary, as Trustees ad litem and individually, and on behalf of all other members of Pittsburgh Die Sinkers Lodge No. 50, Plaintiffs,**

v.

**PITTSBURGH FORGINGS COMPANY, a corporation, Defendant.**

**Civ. A. No. 63–1002.**

United States District Court
W. D. Pennsylvania.
June 16, 1966.

Lloyd F. Engle, Jr., Wilner, Wilner & Kuhn, Pittsburgh, Pa., for plaintiffs.

John G. Wayman, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

WEBER, District Judge.

### FINDINGS OF FACT

1. Plaintiff Union, Pittsburgh Die Sinkers Lodge No. 50 of the International Die Sinkers Conference, is a labor organization within the meaning of the Labor and Management Relations Act, and plaintiffs Harold Johnson and E. C. Baumbeck are individuals bringing this suit on their own behalf and as Trustees ad litem on behalf of all other members of this Union.

2. Defendant, Pittsburgh Forgings Company, is a Delaware corporation, having its principal office and manufacturing plant at Coraopolis, Pennsylvania, producing products and goods at said plant and shipped out of the Commonwealth of Pennsylvania in a twelve month period prior to the trial of this action in excess of $1,000,000.

3. Defendant employs at its Coraopolis, Pennsylvania plant approximately 45 Die Sinkers represented for collective bargaining purposes by the plaintiff Union. Defendant also employs at this plant other production and maintenance

employees to the number of several hundred represented for collective bargaining purposes by the United Steelworkers of America, and also in excess of one hundred (100) salaried employees.

4. From sometime prior to 1940 until August 1, 1964, a collective bargaining relationship existed between plaintiff Union and defendant.

5. The collective bargaining agreement between the Union and the defendant Company was composed of two separate written instruments, one being known as the "Main Bargaining Agreement", setting forth the recognition of the Union and the basic conditions of employment and the other being known as the "Agreement on Economics", setting forth wage rates and classifications of the union employees. As of July 1, 1960, these two agreements consisted of a Main Bargaining Agreement dated September 1, 1948, unchanged since that date, and an Agreement on Economics dated effective July 1, 1960 to remain in effect until June 30, 1963.

6. Neither of the aforesaid agreements taken separately constitute a complete collective bargaining agreement setting forth recognition, general conditions of employment, working conditions, wages and hours; taken together, however, they constitute a complete agreement.

7. As of September 1, 1948, plaintiff Union and defendant entered into a collective bargaining agreement known as the "Main Bargaining Agreement", which provided that it should remain in effect until August 1, 1949, and thereafter continue in force and effect from year to year, unless either party should notify the other in writing sixty (60) days prior to the expiration date of the term of an intention to make changes or terminate.

8. On May 8, 1964, the Company gave written notice of termination of this agreement to be effective August 1, 1964.

9. Effective July 1, 1960, plaintiff Union and defendant Company entered into an agreement called an "Agreement on Economics" which was effective July 1, 1960 until June 30, 1963. This agreement carried no provision for termination by action of either party but on April 30, 1963, plaintiff Union notified defendant Company of its desire to negotiate modification of the conditions therein. This "Agreement on Economics" was concerned with wage rates, job classification, merit increases, insurance, and fringe benefits. This Agreement also contained the following language:

"In the event of any conflict between the provisions of this Agreement and those of the Bargaining Agreement, this Agreement shall govern."

10. Despite the notice of termination the employees continued to work after July 1, 1963, the date of expiration of the "Agreement on Economics", under the terms and conditions of the "Main Bargaining Agreement", and under the wage rates of the "Agreement on Economics" until August 20, 1963, when they went on strike to enforce their demand for a wage increase. This strike continued through to the date of the hearing of this action.

11. The "Main Bargaining Agreement" effective September 1, 1948, contained under the heading "General Conditions", the following two provisions relating to the sub-contracting of dies:

"1. The Company agrees that dies or parts of dies will not be sublet unless all employees are working forty (40) hours or more per week, in all classifications affected."

"2. The Company agrees that insofar as lawful it will not sublet die work to any other than a shop recognized by the International Die Sinkers' Conference."

12. During the period from 1948 down to August 20, 1963, the company sublet manufacture of many dies. During this time no dies were sublet to shops other than International Die Sinkers' Conference Shops.

13. After August 20, 1963, the date of the strike by plaintiff Union, the defendant Company either purchased all its dies from subcontractors or used dies which

the customer furnished in accordance with a long-established prior practice. The dies were not sublet or purchased from International Die Sinkers' Conference Shops.

14. There is no evidence that any dies were sublet prior to August 20, 1963, when this would result in any of plaintiff Union employees being laid off or working less than forty (40) hours per week. Such dies as were sublet when International Die Sinkers' Conference employees worked less than forty (40) hours per week were because of personal reasons over which the employer had no control, but which were in the control of the individual employees.

15. International Die Sinkers' Conference members were aware of the prior practice of the employer to sublet contract dies but neither the International Die Sinkers' Conference nor the Lodge, nor any individual employee ever protested this practice or filed a grievance under the grievance procedure of the Union contract.

## OPINION AND CONCLUSIONS OF LAW

The evidence here has demonstrated that the employer has subcontracted the manufacture of its dies when all of its employees were not working a forty hour week only in two circumstances:

(1) When the employees were on strike and

(2) When the employees, through no fault of the employer, were not available for forty hours of work per week.

■ It is a basic principle of contract law that "a plaintiff cannot prevail in an action for nonperformance of a contract if he alone is responsible for the nonperformance." 17 Am.Jur.2d Contracts § 425 (p. 880), and cases cited. "A party to a contract who prevents performance thereof by the other party, or renders it impossible, may not avail himself of the wrong, and the other party is excused from performance." 17A C.J.S. Con-

tracts § 468, p. 638, and cases cited therein.

■ In two cases involving appeals from the National Labor Relations Board, United States Courts of Appeal have held that the existence of a strike alters the employer's obligation to bargain, and that failure to bargain with the Union over the subcontracting of work during a strike was not an unfair labor practice. Hawaii Meat Co. Ltd. v. N.L.R.B., 321 F. 2d 397 (9th Cir. 1963); N.L.R.B. v. Robert S. Abbott Publishing Co., 331 F. 2d 209 (7th Cir. 1964). In the latter case the Court said at p. 213:

"It would be a startling doctrine indeed if this court were to tell companies and employers faced with extinction because of a strike, that before they can make economic business decisions to contract out work in order to continue operations, they must first consult the union that caused the threat of extinction."

We, therefore, conclude that the provisions of §§ 1 and 2 of the "Main Bargaining Agreement" do not apply during a strike.

■ The plaintiff offered a considerable amount of parol evidence to explain the provisions of the contract. In one instance this consisted of testimony of discussions between the Union's general president and a Mr. Mitchell, defendant's plant manager in 1948, since deceased. We do not believe that such testimony must be excluded under the Pennsylvania Dead Man's Rule, Act of 1887, May 23, P.L. 158; 28 P.S. § 322, since the party to the contract was not Mr. Mitchell but the corporation. In Bates v. Carter Construction Co., 255 Pa. 200, at p. 205, 99 A. 813, at p. 814 (1916), the Court held:

"It could not have been the legislative intent to carry the prohibition so far. It was the individual, personal, adverse interest which was to work a disqualification. In the present case it was the interest of the corporation defendant which was adverse to the witness, and the corporation is living."

The parol evidence offered was to the effect that up to 1946 the word "available" was contained in the general contract, but as a result of subsequent negotiations it was left out. That is the contract of 1940 stated that no dies should be sublet "until employees *available* are working forty (40) or more hours per week." The 1946 version stated "unless all employees are working forty (40) hours or more per week."

Mr. Meiner's testimony as to the time of this change was confused, and his explanation as to the reason for the change was not clear, except that it was for the protection of the Union. We do not find it to be of any help in the interpretation of the contract.

One of the principle extrinsic aids in the interpretation of a contract is the interpretation which the parties themselves have placed upon it.

It was clearly established in the testimony that the Company had subcontracted dies for many years during this contract, that the die sinkers knew of the subcontracting, that they had regular meetings with the department supervisor in which they were given reports of the status of subcontracting work, and that they never made this the subject of a formal complaint or of a grievance procedure under the contract.

> "If the conduct of the parties subsequent to a manifestation of intention indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation." Restatement. Contracts § 235(e).

See Birdsall-Friedman Co. v. Globe & Rutgers Ins. Co., 326 Pa. 404, 190 A. 924 (1937).

Moreover, we believe that the contract must be given a reasonable interpretation.

> "An interpretation which gives a reasonable, lawful and effective meaning to all manifestations of intention is preferred to an interpretation which leaves a part of such manifestation unreasonable, unlawful or of no effect." Restatement. Contracts § 236(a)

A multitude of reasons are apparent to support the conclusion that the intent of the parties was that no work would be subcontracted where the effect was to deprive the existing Union employees of forty (40) hour of work per week. This plant required dies to operate. If the supply of dies were to be subject to a bottleneck of the lack of available die sinkers in the plant for forty (40) hours of work each week, through no fault of the management, the entire operation of the plant of many hundred workers must stop. This is certainly not a reasonable interpretation, and the conduct of the parties indicates that it was not so intended. We find it to be a particularly strained, unreasonable and illogical contention that such a provision would prevent sub-letting of this work when the employees concerned were on strike over matters of wage rates, having no relation to the question at issue here. The construction which makes a contract fair, customary or prudent is to be preferred to that which makes it unusual, inequitable or imprudent. Consolidated Tile and Slate Co. v. Fox, 410 Pa. 336, 189 A.2d 228 (1963).

With respect to § 2 of the General Conditions of the "Main Bargaining Agreement" providing:

> "The Company agrees that insofar as lawful it will not sublet die work to any other than a shop recognized by the International Die Sinkers' Conference,"

we find that the provision is tainted by a suspicion of illegality by its very words, and that the agreement is illegal as an unfair labor practice under the provisions of § 704(b) of the Labor Management Reporting and Disclosure Act of 1959, 28 U.S.C. § 158, which makes such restrictive agreements void.

To the extent that plaintiffs have failed to use the grievance procedure with respect to the long-standing practice of the company in subcontracting prior to the strike, they are likewise barred from

a court determination of this question by their failure to exhaust this administrative procedure. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

We, therefore, conclude that there has been no showing of need or justification for the injunction prayed for in Plaintiffs' Complaint and that plaintiffs have failed to prove any violation of the agreement in question.

Judgment for defendant.