652 A.2d 930

**Joseph D. FLANAGAN, Appellant,**

**v.**

**FIDELITY BANK, Appellee.**

Superior Court of Pennsylvania.

Argued Nov. 30, 1994.

Filed Jan. 20, 1995.

Robert J. Kerns, Lansdale, for appellant.

Alan J. Josel, Public Defender, Norristown, for appellee.

Before OLSZEWSKI, JOHNSON and HESTER, JJ.

OLSZEWSKI, Judge:

In June 1968, Joseph Flanagan purchased a $9,900 certificate of deposit from Fidelity Bank. This two-year CD paid five percent interest. Flanagan was soon called for a tour of duty in Vietnam, and gave the CD to his father for safekeeping. Flanagan returned in 1971, but forgot about the CD.

The Bank never sent Flanagan anything regarding the CD: no notice of maturity, no tax forms, no inquiry as to why Flanagan had not yet redeemed it.

In January of 1990, Flanagan found the CD and brought it to Fidelity Bank for redemption. The Bank had no records of the 1968 purchase, and refused payment.[1] The Bank later sent a letter to Flanagan confirming that the funds were not escheated to the Commonwealth.

Flanagan sued the Bank for payment. After a brief bench trial in 1993, the trial court found for the bank, but then changed its mind and granted judgment notwithstanding the verdict for Flanagan.[2] The court determined that Flanagan had carried his burden of proof, the CD was a valid instrument, and the Bank would have to honor it. This decision has not been appealed. Rather, the question before us concerns the trial court's valuation of the CD.

The trial court found that the only evidence before it was the CD itself, and its value would be determined by its terms. Trial court opinion 7/1/94 at 3–4. The terms of the CD are stated on the face of the certificate. *See* R.R. at 8a (photocopy of the CD). The CD states:

1. My colleague, Judge Johnson, hypothesizes that the Bank might have sent notice of maturity to Flanagan's parents, who in turn might not have received it because they moved to Florida in 1969. Of course, if the Bank had sent any such notice and retained some record of it, then this appeal would probably not be before us. The Bank failed to prove that it sent notice and created this unusual situation by destroying its own records before twenty years had passed. We must now view the evidence in the light most favorable to the de facto verdict winner, and accept Flanagan's contention that the Bank never sent him any notice of maturity.

2. Pennsylvania caselaw presumes that debts more than twenty years old have been paid, rebuttable only by clear and convincing evidence which must consist of more than the instrument sued upon itself. *See Rosenbaum v. Newhoff*, 396 Pa. 500, 152 A.2d 763 (1959). The trial court originally reasoned that twenty years had passed since Flanagan purchased the CD, so the presumption would operate against him. Flanagan pointed out at post-trial motions that the CD was not redeemable until June of 1970, and he took it to the Bank in January of 1990. The trial court apparently agreed with Flanagan that the debt was less than twenty years old, so the Bank had to prove payment, which it could not do. The court thus found for Flanagan.

> This Certificate is not transferable or assignable except on the books of the Bank. Bank will pay on the maturity date or on any three (3) month anniversary of the date of issue the principal amount shown above, together with interest for each full three (3) month period from the date of issue at the rate of five percent (5%) per annum, compounded daily. If not surrendered at maturity, this Certificate shall be renewed at its principal amount and accrued interest for similar successive periods unless Bank shall have mailed to payee notice that it will not be renewed thirty (30) days or more prior to maturity. No interest will accrue after final maturity. . . .

*Id.;* opinion at 3.

The trial court decided that under these terms, the present value of the CD was its $9,900 principal plus five percent interest for two years. The court awarded prejudgment interest at the legal rate of six percent from the date Flanagan attempted to redeem the CD (January of 1990), but the court held that no interest accumulated between 1970 and 1990. Flanagan appeals this part of the trial court's decision.

The trial court reached this conclusion by interpreting the CD's contractual language. The court stated:

> The terms of the certificate do not specify what interest rate will apply when the certificate is renewed. The first part of the afore-mentioned terms specifically provides that a five (5%) percent interest rate is to be applied for each three month period from the date of issue until the maturity date. Once the maturity date passes without the certificate being presented for payment, the certificate was to renew. However, unlike the above provision, this portion of the terms does not state a specific interest rate. The statement "[t]his Certificate shall be renewed at its principal amount and accrued interest for similar successive periods" tells the holder at what amount the principal will be worth. It does not indicate the interest rate. Since no applicable interest rate was assigned under the terms of the certificate, and no evidence was presented at trial about the relevant interest rates for the time period at issue, no interest could be

awarded by the Court and the failure to do so for the period of 1970 until 1990 was not in error.

Opinion at 4.

■ The interpretation of a contract is a question of law, so our review is plenary. *Meeting House Lane, Ltd. v. Melso,* 427 Pa.Super. 118, 628 A.2d 854 (1993). The CD is not a particularly well-drafted instrument, and reasonable people might differ over the meaning some of its terms.[3] We think the trial court's interpretation is untenable, however, because it ignores the plain and accepted meaning of the word "renew."

■ The trial court acknowledged that if not redeemed in 1970, the CD would not sit dormant without earning interest, but would "renew." "To 'renew' a contract means to begin again or continue in force the old contract." Black's Law Dictionary, 5th ed. The old contract (that is, the CD itself) paid five percent interest per year, compounded daily and posted quarterly. By using the term "renew," the CD does indicate the applicable interest rate: the originally stated rate of five percent. We see no reason to consider prevailing market rates, or read in a rate of zero percent, as the trial court did.

Not only is this the plain and obvious interpretation, but it best comports with the rest of the contract. In 1968, the Bank was willing to pay five percent on a two-year CD. If interest rates went up, the Bank would be delighted to keep paying the low rate of five percent for however long the CD holder would accept it. If interest rates went down, the Bank could call the CD by giving notice that it would no longer renew it. That, presumably, is when the CD would reach final maturity, and no further interest would accrue.

Here, the Bank never called the CD or escheated the money to the Commonwealth, but continued to enjoy the use of

---

**3.** For instance, it is not perfectly clear when the CD reaches "final maturity."

Flanagan's $10,941.11.[4]   Doubtless the Bank was able to make more than $18,000 on this principal between 1970 and 1990 by employing sound banking practices and making prudent loans.[5]   To deny Flanagan the time value of his investment would thus not only be arbitrary and contrary to the plain language of the CD, it would unjustly enrich the Bank as well. We therefore vacate the trial court's order and remand with instructions that Flanagan be awarded the full value of his CD, plus prejudgment interest from the date Flanagan presented it.

Vacated and remanded;  jurisdiction relinquished.

Concurring and dissenting opinion by JOHNSON, J.

JOHNSON, Judge, concurring and dissenting.

Following a trial without a jury, the Honorable Albert R. Subers rendered a verdict for the defendant, Fidelity Bank (the bank), on an action in assumpsit to recover upon a growth certificate of deposit (CD) issued by the bank to Joseph D. Flanagan in 1968.   After consideration of post-trial memoranda and oral argument, Judge Subers entered judgment notwithstanding the verdict and awarded Flanagan the sum of $9,900, the face amount of the CD.   The court also awarded five percent interest for the two-year period from June 6, 1968 to June 6, 1970, and six percent interest from January 1, 1990, the date when Flanagan first made demand for payment on the CD.

The bank has not appealed that award.   Flanagan appeals, limiting his appeal to his contention that Judge Subers erred in failing to award five percent interest beyond a two-year period in accordance with the terms of the CD dated June 6, 1968.

**4.**   This is what the CD would have been worth on its maturity date of June 6, 1970.

**5.**   $10,941.11 earning 5% interest compounded daily for 7,123 days (which is 19 years and 6 months from June 6, 1970) would become $29,007.15.   The difference of $18,066.04 is the amount at stake in this appeal.

When Flanagan purchased the CD, he resided with his parents. Shortly thereafter, Flanagan was called for a tour of duty in Vietnam, and he left the CD with his father. Flanagan did not return from Vietnam until 1971. His parents' address in June of 1968 appears on the face of the CD. Although the CD includes a box in the upper left corner for the insertion of the depositor's social security or tax identification number, this box was not filled in at the time of issuance of the CD in 1968.

I cannot join in my colleague's assertions that the bank never sent Flanagan notice regarding the CD. Judge Subers did not find this to be a fact, and the notes of testimony do not support such an assertion. It can be concluded from the uncontradicted testimony of Flanagan that his parents abandoned their residence at the address recorded on the face of the CD no later than June 1969, when they moved to Florida. Any notice regarding the bank's intent not to renew the CD would have been mailed to the address shown on the CD, an address from which the Flanagans removed themselves fully one year before the CD would have matured in June, 1970. There was no direct testimony from Flanagan's parents, who were not called as witnesses. The parties stipulated that the bank had no records concerning this particular CD. There was no direct evidence to support my colleague's conclusion that the bank never sent notice to its depositor.

In terms of the narrow issue preserved for appeal, the question of notice may well be considered immaterial. We are called upon to decide only whether Flanagan is entitled to receive five percent interest from June 6, 1970, to January 1, 1990.

As a starting point, we should determine if the CD provides any guidance in deciding this question. Pursuant to the terms of the CD, it matured on June 6, 1970. If not redeemed at that time, absent any notice to the contrary from the bank, the CD would renew. The CD contained the following language:

If not surrendered at maturity, this Certificate shall be renewed at its principal amount and accrued interest for

similar successive periods unless Bank shall have mailed to Payee notice that it will not be renewed thirty days or more prior to maturity. No interest will accrue after final maturity.

My colleagues, in considering this language, assert, without citation to any authority:

By using the term "renew", the CD does indicate the applicable interest rate: the originally stated rate of five percent. We see no reason to consider prevailing market rates, or read in a rate of zero percent, as the trial court did.

Not only is this the plain and obvious interpretation, but it best comports with the rest of the contract. . . .

. . . . To deny Flanagan the time value of his investment would thus not only be arbitrary and contrary to the plain language of the CD, it would unjustly enrich the Bank as well.

Majority opinion at 520–521.

Unlike the majority, I find this interpretation of the CD to be neither plain nor obvious. While the instrument declares in the simplest of terms that "no interest will accrue after final maturity," the term "final maturity" is not defined in the instrument and, in my judgment, would escape rational definition if the analysis remains confined to the written agreement before us. I do not believe any conclusion is possible as to the "final maturity" date or the rate of interest to be applied.

Moreover, this appeal involves the interpretation of a form of CD utilized by a Pennsylvania bank in the late 1960's. There is nothing in the record to suggest that the poorly-worded declaration on the front of this CD remains in use by the successor-in-interest to the bank on this appeal, or by any other financial institutions. Therefore, I cannot believe that our interpretation of the word "renewed," as the majority declares, involves a legal issue of continuing public interest. On the contrary, I fear that our attempt to construe language on an outdated instrument might well have adverse implications for current mercantile practice.

Flanagan cites only to *Ballentine's Law Dictionary,* Third Edition, in support of his argument that he is entitled to five percent interest throughout the period of non-presentation of the CD for payment. Brief for Appellant at 13–14. The majority cites only to *Black's Law Dictionary,* Fifth Edition, on the same issue. Majority slip opinion at 920. This paucity of authority suggests, also, that disposition of this appeal without attempting to establish new law might well be in order.

Where the bank has not challenged the underlying award of the principal sum found due on the CD, I would limit myself to an analysis based upon equitable principles, much as the majority has suggested in its alternative analysis. It is unlikely that fair-minded people within the banking community could find fault with a conclusion that Flanagan should not be denied the time value of his investment, given the fact that the bank has had the use of his funds—or at a minimum is unable to establish non-use of Flanagan's funds—over the entire period from June 1968 until January 1990. Since equity would dictate that the depositor should not be made to bear the loss against a commercial entity possessing the resources to soundly administer funds held by it in a fiduciary capacity, I concur in my colleagues' conclusion to remand this matter for the award of five percent interest over the entire period the CD remained in the bank's possession prior to demand. I am unable to join and must dissent from, so much of the majority opinion as finds a basis in contract law and the interpretation of the language of the CD to support the remand.