**Delores LIDDLE, Appellant,**

v.

**Denise SCHOLZE and Gary Scholze, Appellees.**

Superior Court of Pennsylvania.

Argued Oct. 17, 2000.

Filed March 2, 2001.

Jeffrey Kramer, Washington, for appellant.

Samuel S. Pangburn, Pittsburgh, for appellee.

Before CAVANAUGH, EAKIN and TAMILIA, JJ.

EAKIN, J.

¶ 1 The emu's a bird quite large and stately, whose market potential was valued so greatly that a decade ago, it was thought to be the boom crop of the 21st century.

¶ 2 Our appellant decided she ought to invest in two breeding emus, but their conjugal nest produced no chicks, so she tried to regain her purchase money, but alas in vain.

¶ 3 Appellant then filed a contract suit, but the verdict gave her claim the boot; thus she was left with no resort but this appeal to the Superior Court.

¶ 4 Delores Liddle paid $48,000 to Denise Scholze for a male emu, which she named Nicholas, and a female she named Savannah, hoping to breed the birds and cash in on the anticipated emu bonanza. Liddle's investment advisor, William Coen, however, was concerned about the volatility of the emu market, and as the parties recognized infertility was a real possibility, Scholze signed a letter providing:

> If for any reason the emus Delores purchases do not lay eggs in the 93–94 season I will buy the birds from her for the amount paid in emu chicks from my own breeders.

¶ 5 Nicholas and Savannah produced no little emus during the 1993–1994 season. Scholze testified that pursuant to the agreement, she offered Liddle a dozen chicks valued at $4,000 each. Liddle declined them, choosing instead to see if Nicholas and Savannah would produce in the next breeding season. The barren birds were sent to Louisiana with some other fruitless feathered couples, in hopes the warmer climes would increase their yield, but a year later there were still no offspring. Then the emu market crashed.[2] Liddle sought return of her money, Scholze refused, and Liddle brought suit. After a non-jury trial, the court found Liddle's failure to accept reimbursement at the end of the 1993–1994 breeding season relieved Scholze of liability. Specifically, the court determined:

> Based upon the evidence and testimony presented the Court finds that the Plaintiff chose not to proceed to enforce the guarantee provisions of the agreement in the spring and summer of 1994. Having chose to proceed with her investment the Defendant is relieved of any liability under the agreement.

Trial Court Memorandum and Verdict, 11/9/99, at 2. On appeal, Liddle argues the trial court committed reversible error by

---

**2.** Proponents of the emu market likened them to the buffalo; there were uses projected for every part of the bird. Experience, however, proved the meat was a bit oily, the skin was an inferior alternative to leather, and the sales of emu-based cologne, a dubious marketing notion, understandably did not take off. Further examination of the history and anatomical structure of emus was authored by Judge Popovich in *Smith v. Penbridge Associates, Inc.*, 440 Pa.Super. 410, 655 A.2d 1015 (1995).

finding Scholze established a valid waiver or modification of the agreement.

¶ 6 Whether a trial court properly interpreted a contract is a question of law and this Court's scope of review is plenary. *Flanagan v. Fidelity Bank,* 438 Pa.Super. 516, 652 A.2d 930 (1995). We need not defer to the conclusions of the trial court and are free to draw our own inferences. *Ratti v. Wheeling Pittsburgh Steel Corp.,* 758 A.2d 695 (Pa.Super.2000). In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. Halpin v. LaSalle University, 432 Pa.Super. 476, 639 A.2d 37, 39 (1994), *appeal denied,* 542 Pa. 670, 668 A.2d 1133 (1995).

¶ 7 The letter clearly provides that the want of eggs during the 1993–1994 season triggered a buy-back provision, but its express terms do not address when the demand or the exchange itself must be made. Where an agreement contains no express provision, we determine the parties' intention in that regard from the surrounding circumstances and by application of a reasonable construction of the agreement as a whole. *Price v. Confair,* 366 Pa. 538, 79 A.2d 224, 226 (1951).

¶ 8 The deal was two birds for $48,000, and the guarantee was just as simple: if they are chickless that first season, Scholze agreed to take back the two big birds in return for $48,000 worth of little birds. There is no evidence Scholze agreed to refund the purchase price itself; we see nothing suggesting the proverbial money back guarantee, eggs or no eggs. Also of significance is the implicit right of Liddle to decline that remedy. While there was no specific testimony about expectations of the time to assert that remedy, the guarantee was to protect Liddle. Like a penalty in football, the offended party may decline the remedy and play on; once declined, however, she cannot reconsider and accept the penalty after the next play.

¶ 9 Liddle asserts that adding a time limit to the letter is either a modification or a waiver of that guarantee provision which the evidence failed to prove. Liddle insists that once the triggering event occurred in early 1994, she was entitled to seek reimbursement until the spring of 1998, when a contract action would have been time-barred under 42 Pa.C.S. § 5525. After careful review, we cannot agree.

¶ 10 Liddle's theory would have her remedy intact until she chooses to demand it, no matter the egg production in the interval. It would allow her to keep the breeding pair without risk and exchange them at any time before the statute of limitations ran, even if the pair gave her 100 chicks in subsequent years. The contract clearly envisions a "keep *or* give back" scenario; there is no indication it was meant as a "keep *and* give back" clause. As Scholze testified: "That letter wasn't about profit. It was only to assure her that *she would have something at the end of the first year* besides her breeder birds. You know, she had an alternative route, you know, not to lose her investment." N .T., 10–15–99, at 72 (emphasis added).

¶ 11 Liddle may have had several years to enforce her remedy if Scholze tendered no chicks. However, once Scholze offered to fulfill her duties under that provision, there was no lack of performance. Conduct of one party that prevents the other from performing is an excuse for nonperformance. *United States v. Peck,* 102 U.S. 64, 65, 26 L.Ed. 46 (1880). By preventing Scholze's performance, Liddle excuses it. *See Craig Coal Mining Co. v. Romani,* 355 Pa.Super. 296, 513 A.2d 437, 440 (1986), *appeal granted,* 514 Pa. 624, 522 A.2d 50 (1987); *see . also Pittsburgh Die Sinkers Lodge No. 50 v. Pittsburgh Forgings Co.,* 255 F.Supp. 142, 145 (W.D.Pa.1966)("[A] plaintiff cannot prevail in an action for nonperformance of a contract if he alone is responsible for the nonperformance").

¶ 12 Liddle maintained Scholze did not offer her the chicks and she did not demand them; she contended Scholze only offered the advice to send the birds to a

warmer climate. Scholze refuted these claims and testified, "I told her that I could take her breeders back as the contract said." N.T., 10/15/99, at 78. Scholze also offered the testimony of Eric Metz, an apparent witness to Scholze's tender. It is clear from the substance of the trial court's opinion, indeed from the verdict itself, that the court resolved this credibility conflict in testimony in favor of Scholze, a resolution certainly within its role as factfinder. *Turney Media Fuel,* at 841. We are not free to substitute our opinion for that of the factfinder. *Id.*

¶ 13 The trial court did not find a modification of the agreement; the court construed the agreement as written, finding it required a demand for reimbursement at the end of the 1993–1994 season. This was a reasonable conclusion particularly in light of the court's manifest credibility determinations and the evidence regarding the unpredictability of the emu market. The construction implied a term that is reasonable; we find nothing consistent with an intention to allow Liddle to decline the tender of chicks, keep the breeding pair another three years, then make the exchange. Once accrued, Liddle's rights to demand chicks cannot be extended indefinitely in the face of Scholze's tender. By failing to accept Scholze's offer to perform in 1994, Liddle was precluded from invoking the remedy in later years.

¶ 14 The fault's the emus', not that of Liddle, or Scholze, or the court placed in the middle. Fruitless in Pennsylvania and Louisiana, the blame's on Nicholas and Savannah.

¶ 15 The learned trial court, in well reasoned words, held Liddle's case was flightless as the birds, and her appeal in turn we now must find as barren as the breeders here maligned.

¶ 16 Judgment affirmed.

¶ 17 TAMILIA, J. concurs in the result.