J-S49015-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| GERALD N. KREISER, III, | |
| Appellant | No. 1773 MDA 2014 |

Appeal from the Judgment of Sentence Entered May 22, 2014
In the Court of Common Pleas of Perry County
Criminal Division at No(s): CP-50-CR-0000399-2013

BEFORE: BENDER, P.J.E., ALLEN, J., and OLSON, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED AUGUST 28, 2015**

Appellant, Gerald N. Kreiser, III, appeals from the May 22, 2014 judgment of sentence of 36 to 72 months' incarceration, followed by two years' probation, imposed after a jury convicted him of aggravated assault and simple assault. Appellant challenges the sufficiency and weight of the evidence, as well as the legality of his sentence. After careful review, we vacate Appellant's judgment of sentence and remand for resentencing.

Appellant's convictions stemmed from a March 25, 2013 altercation with the victim, Robert Mourey. At trial, the Commonwealth presented evidence that Appellant and his co-defendant, Gregory Mader, went to Mourey's home and repeatedly punched him in the head, arms, and legs. During the attack, Mourey was struck in the head with a chair, fell through a glass coffee table, and his head hit and punctured a wall in the residence.

As a result of the fight, Mourey sustained significant injuries and was hospitalized for seven days. While Appellant asserted at trial that he acted in self-defense, the jury disbelieved that claim and convicted him of the above-stated offenses. Appellant was sentenced on May 22, 2014, to a term of 36 to 72 months' for his aggravated assault offense, and a consecutive term of two years' probation for his simple assault conviction.

The trial court's docket indicates that Appellant filed a timely post-sentence motion on June 2, 2014. However, the motion itself is not included in the certified record. Over the next two months, Appellant requested several extensions of time within which to file an amended post-sentence motion. The court granted Appellant three extensions, contrary to the mandate set forth in Pa.R.Crim.P. 720(B)(3)(b) (directing that the trial "judge may grant *one* 30-day extension for decision on the motion") (emphasis added). Despite being granted these extensions of time, Appellant never filed an amended post-sentence motion. Instead, on October 20, 2014, he filed a notice of appeal with our court, asserting that his June 2, 2014 post-sentence motion was denied by operation of law on September 19, 2014. **See** Pa.R.Crim.P. 720(B)(3)(a) (stating that if the court fails to decide a post-sentence motion within 120 days of the filing date, the motion will be deemed denied by operation of law).[1] However, the

_____

[1] We note that 120 days from June 2, 2014, was September 30, 2014.

trial court's docket did not contain any order, entered on September 19, 2014 or otherwise, directing that Appellant's post-sentence motion was deemed denied by operation of law. Nevertheless, the trial court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and Appellant timely complied. The court subsequently issued a Rule 1925(a) opinion.

Herein, Appellant presents four issues for our review:

1. Should [Appellant's] [a]ppeal be quashed as having been taken from a purported order, which was not entered upon the appropriate docket of the lower court[?]

2. Did the Commonwealth, as a matter of law, provide insufficient evidence to meet its burden of proof with regard to Count I – Aggravated Assault, 18 Pa.C.S.A. §2702(a)(1) and Count II – Simple Assault, 18 Pa.C.S.A. §2701(a)(1), as [Appellant] was justified in using self-defense since he was lawfully on the property where the incident occurred, reasonably believed that force was immediately necessary to protect against death or serious bodily injury, and [the victim,] Mourey[,] greeted him with a lethal weapon in hand[?]

3. Whether the verdict entered finding [Appellant] guilty of Count I – Aggravated Assault and Count II – Simple Assault was against the weight of the evidence as [Appellant] lawfully used self-defense and had a right to "stand his ground" as he was lawfully on the property, reasonably believed that force was immediately necessary to protect against death or serious bodily injury, and Mourey greeted [Appellant] with a lethal weapon in hand?

4. Whether the sentence imposed by the trial court for Count I – Aggravated Assault and Count II – Simple Assault is illegal as both counts should have merged for sentencing?

Appellant's Brief at 1-2.

To understand Appellant's first issue, it is necessary to summarize the following procedural history. On November 10, 2014, this Court issued a *per curiam* order directing Appellant to show cause as to why his appeal should not be quashed as having been taken from an order not entered on the trial court's docket, *i.e.* the September 19, 2014 order denying Appellant's post-sentence motion. **See** Order, 11/10/14 (citing Pa.R.A.P. 301(a)(1), which states that no order of court shall be appealable until it has been entered upon the appropriate docket in the lower court). Appellant filed a response, explaining that on November 14, 2014, when he 'hand filed' his Rule 1925(b) statement, he asked the Perry County Clerk of Courts why a final order denying his post-sentence motion by operation of law had not yet been entered on the docket. Appellant alleged that the clerk informed him that it was a mistake, and that the order would be entered that day. Appellant attached to his response an updated trial court docket showing the entry of an order on November 14, 2014, denying Appellant's post-trial motion by operation of law. Based on this response, our Court discharged the November 10, 2014 show-cause order, and deferred this procedural issue to the discretion of the panel.

The Commonwealth now avers that we should quash Appellant's appeal because his notice of appeal "was premature." Commonwealth's Brief at 4. Appellant responds that the error of filing his notice of appeal prior to the entry of the November 14, 2014 order denying his post-sentence motion was "harmless and was the result of a breakdown in the court

- 4 -

system...." Appellant's Brief at 19-20. Accordingly, he requests that we consider his appeal.

We acknowledge that Appellant's counsel should have inquired with the Clerk of Courts about the entry of a final order pertaining to the post-sentence motion *before* he filed a notice of appeal. However, it is apparent that mistakes were also made by the trial court and by the Perry County Clerk of Courts. Consequently, in the interests of judicial economy, we will overlook the prematurity of Appellant's notice of appeal, and treat it as having been filed on November 14, 2014, the date of the entry of the final order denying Appellant's post-sentence motion. *See Liddle v. Scholze*, 768 A.2d 1183, 1184 n.1 (Pa. Super. 2001) (treating a premature notice of appeal as having been "filed after entry of judgment") (citing Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before entry of an appealable order shall be treated as filed after such entry and on the day thereof.")).

Appellant next argues that the evidence was insufficient to prove that he committed either aggravated or simple assault.

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. *Commonwealth v. Moreno*, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. *Commonwealth v. Hartzell*, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it

- 5 -

links the accused to the crime beyond a reasonable doubt. ***Moreno, supra*** at 136.

***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011).

Here, Appellant focuses his sufficiency of the evidence argument on claiming that the Commonwealth failed to rebut his assertion of self-defense. Appellant maintains that he "did not spontaneously start a fight[]" but, instead, he "instinctively reacted to a situation that Mourey created." Appellant's Brief at 26. Appellant insists that "Mourey [] answered the door with what appeared to be a knife" and Appellant "was fighting in self-defense because of the threat of the knife…." ***Id.*** at 28. Appellant contends that the Commonwealth failed to proffer sufficient evidence to disprove that he fought with Mourey in self-defense.

In assessing Appellant's argument, we begin by summarizing the pertinent evidence presented at his trial. First, Mourey testified that at the time of this incident, he was living with Trisha Kreiser, with whom he had had a romantic relationship, despite Ms. Kreiser's marriage to Appellant. N.T., 3/24/14, at 34-36. Mourey explained that he and Ms. Kreiser had ended their relationship in February of 2013, but were still living together in March of that year. ***Id.*** at 36. Mourey testified that on March 25, 2013, he was angry with Ms. Kreiser because he believed she "was having some sort of a relationship with somebody else." ***Id.*** at 37. The two began an argument that morning, which continued by text messaging throughout the day. ***Id.*** That evening, Mourey became aware that Ms. Kreiser was with Appellant and Gregory Mader, Appellant's co-defendant in this case. ***Id.*** at

39. Mourey testified that Appellant and Mader began sending him angry text messages, as well. *Id.* at 39-40.

At some point later that evening, Mourey heard a knock on the door between his kitchen and garage, and Ms. Kreiser's voice telling him to open the door. *Id.* at 43-44. Mourey admitted that when he heard the knock, he had in his hand a "three-inch regular pocket knife" because he was in the process of cutting up some boxes owned by Ms. Kreiser. *Id.* at 44. Mourey stated that, with the knife still in his hand, he opened the door between the kitchen and garage and "was immediately pushed back by [Appellant]…." *Id.* at 45. Mourey elaborated:

> I had the door open maybe … 30 degrees before I was just shoved back and pushed up against the wall, had my arms back like this, had the knife in my hand like this. I let go of the knife, because that was not my intent whatsoever. You know, I was just cutting up boxes. I was completely taken by surprise, obviously…."

*Id.* at 46. While Appellant was pushing Mourey, Mourey saw Ms. Kreiser and Mader "running through the door" and into the house. *Id.* at 46.

Mourey then described the fight that ensued between himself, Appellant, and Mader. At one point, Mourey was wrestling with Appellant when Mader "grabbed a heavy dining room chair and broke it over the back of [Mourey's] head." *Id.* at 48. After being struck with the chair, Mourey stopped fighting back, yet Appellant and Mader continued to beat him all over his "body, … head, … arms, [and] legs." *Id.* at 50-51. The fight traveled into the living room of Mourey's home, where Mourey "got pushed

up against the wall[]" and his "head went through the wall…." *Id.* at 50. In total, Mourey estimated he was hit by Appellant and Mader approximately 20 to 30 times. *Id.*

Once Appellant and Mader stopped their attack, Mourey went into a bathroom and cleaned off the "[m]assive amount of blood that was all over [him]," and Ms. Kreiser then transported Mourey to the hospital. *Id.* at 52-53, 54. Mourey sustained significant injuries as a result of the attack, including: a laceration on his head; cuts on his face and body that required stitches; multiple broken bones, including his nose, orbital bone, finger, and "a tibia plateau fracture" on his right leg; and "acute renal failure" due to "the amount of trauma that [his] body experienced…." *Id.* at 58, 61, 66, 68. He was hospitalized for seven days, *id.* at 69, and was unable to return to work for five months. *Id.* at 82.

Ms. Kreiser also testified at Appellant's trial. She stated that there were three steps from the floor of the garage to the door leading into the kitchen of Mourey's home. *Id.* at 230. She testified that she knocked on the door to the kitchen, but there was no response, so she began to walk toward the door leading to the outside patio. *Id.* As she was walking away, she "hear[d] the door being yanked open, the inside door[,]" and she turned to see Mourey "on the step of the door with a knife." *Id.* at 231. Ms. Kreiser testified that Mourey was "coming out [of] the door[]" with the knife raised at shoulder height. *Id.* She stated that as Mourey came out, Appellant was at the bottom of the steps leading to the door. *Id.* at 232.

Ms. Kreiser heard Appellant scream that Mourey had a knife, at which point she "[r]an out the door" to the outside. *Id.* at 233. Ms. Mourey stated that when the door opened, Appellant could have also left the garage but, rather than doing so, "[h]e went towards [Mourey]." *Id.* at 265.

A short time later, Ms. Kreiser came back inside and saw Appellant and Mourey wrestling on the ground in the kitchen. *Id.* at 233. She explained that Appellant was "on [Mourey's] back basically – like towered over him." *Id.* She watched the attack proceed into the living room, where Mourey "went through the coffee table – the glass coffee table[,]" after which she saw [Appellant] "throw his shoulder into [Mourey]" who "hit the wall[]" and became "dazed…." *Id.* at 234. Ms. Kreiser also testified that when the fighting stopped, she helped Mourey clean himself up and took him to the hospital. *Id.* at 236.

Appellant also testified at trial. He stated that after Ms. Kreiser knocked on the door leading from the garage to the kitchen and received no answer, she began to walk outside, followed by Mader. *Id.* at 320. At that point, Appellant "hear[d] the door open[]" and saw Mourey, with "his hand up behind the door hiding it a little bit." *Id.* Appellant continued:

> The next thing I know he's on me like he's coming at me. So I charged him. Pushed him back into the corner against the wall, small corner like this. Put my head against him, and … I'm up against this side of him. He has a knife in his right hand. I twisted his hand down, put it to his side, pried on it…. That's when I said to [Mader], he's got a damn knife … or something like that.

*Id.*

- 9 -

When later asked at what point he first saw the knife in Mourey's hand, Appellant replied:

> I knew he had something in his hand. I wasn't exactly sure what it was, but I knew he was hiding it like he was ready – he didn't want me to see. He didn't want it to be in plain view. So he kind of moved. I went towards the hand, grabbed his hand; and I twisted it down. … I pushed him into the corner. Tweaked his … hand back and pried as hard as I could to get it out."

*Id.* at 321.

Appellant then explained that inside the house, "a massive scuffle[]" ensued during which both men were "charging" each other and Mourey was "totally going psycho," which put Appellant "in fear for [his] life." *Id.* at 323, 325. Appellant testified that during the fight, he did not intend to cause Mourey serious bodily injury but, instead, he was simply trying "to make him … stop the whole thing." *Id.* at 330. Appellant stated that Mourey "wouldn't stop. Wouldn't give up." *Id.* Appellant believed that Mourey "was trying to kill [him] or trying to kill whoever was behind the door." *Id.* at 331. When asked why he did not retreat when Mourey opened the door, Appellant answered,

> If I would have turned, I … thought maybe he would have shot me in the back or something. At that point, I just knew he had something. I could see the look in his eye that he was pissed, that he had something. So, I mean, it was a split-second decision. I just charged for him, and I realized … that's where it started.

*Id.* at 331-332.

- 10 -

Appellant stated that when the fight eventually stopped, Mourey was lying on the floor. *Id.* at 237. Then, while Ms. Kreiser was upstairs helping Mourey clean up, Appellant cleaned blood off himself in a downstairs bathroom. *Id.* at 328. Appellant stated that he "had some bumps on [his] head but no major gashes or cuts or anything like that." *Id.* at 329. When Ms. Kreiser and Mourey left for the hospital, Appellant and Mader went home. *Id.* at 330.

Finally, Mader testified at trial. He stated that after Ms. Kreiser knocked on the door and received no response, he followed her out "of the garage door to go the exterior, outside." *Id.* at 352. As Mader "was walking through the threshold behind her … [he] heard a swoosh, which was the door being flung open." *Id.* A few seconds after that, Mader heard Appellant say, "he's got a fucking knife." *Id.* Mader testified that by the time he turned around, "[t]hey weren't there." *Id.* Mader stated that he entered the house and saw Mourey on top of Appellant, who was "laying in a pool of blood…." *Id.* at 352-353. Mader began kicking Mourey "as hard as [he] could[]" to make him "[s]top attacking [Appellant]." *Id.* at 354. Mader testified that he did not specifically recall striking Mourey with a chair, but he "may have." *Id.* at 355. He claimed that the fight "was up and down" and Mourey "kept getting up[,]" even "with [Appellant] on his back…." *Id.* It was not until Mourey's head went through the wall and he got "drywall dust in his eyes" that he finally stopped fighting. *Id.* at 357.

On cross-examination, the Commonwealth confronted Mader with a statement he provided to police two days after the incident, in which he told police that "when [he] came in[to the house], [Appellant] had [Mourey] up against a wall, [Appellant] was trying to get the knife out of [Mourey's] hand, and that's where [Mader] began to assist[.]" *Id.* at 365. Mader stated that he "really [did not] remember that." *Id.*

Appellant now contends that this evidence failed to disprove his claim that he acted in self-defense.

> When an accused raises a self-defense claim, the Commonwealth must prove beyond a reasonable doubt that the defendant's acts were not justifiable self-defense.
>
>> The Commonwealth sustains this burden if it establishes at least one of the following: 1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety. It remains the province of the jury to determine whether the accused's belief was reasonable, whether he was free of provocation, and whether he had no duty to retreat.

*Commonwealth v. Hammond*, 953 A.2d 544, 559 (Pa. Super. 2008) (citations omitted).

Viewing the above-stated evidence in the light most favorable to the Commonwealth, we conclude that it was sufficient to disprove Appellant's claim of self-defense. *See Commonwealth v. Coronett*, 455 A.2d 1224, 1228 (Pa. Super. 1983) (stating that in assessing a claim "that the Commonwealth's evidence was insufficient to prove that [the defendant's] actions were not in self-defense[,]" this Court "must view the evidence in

- 12 -

the light most favorable to the Commonwealth as verdict winner.") (citation omitted). First, the evidence demonstrated that Appellant provoked the fight with Mourey. Specifically, Appellant admitted that he sent Mourey text messages with "fighting words" before going to Mourey's house. N.T. at 333. While Appellant now claims that "the time in between the texts and the fight was … sufficient for a cool down[,]" at trial Appellant testified that he was "pissed" when he arrived at Mourey's house. N.T. at 333. Thus, we conclude that the evidence proved that Appellant provoked the fight with Mourey.

Additionally, the evidence demonstrated that Appellant unjustifiably *continued* the use of force after disarming Mourey. Appellant and Mourey both testified that Mourey dropped the knife just inside the doorway of Mourey's home. Nevertheless, Appellant and Mader continued to beat Mourey, with Mader at one point striking Mourey in the head with a chair. Mourey stated that after that blow, he stopped fighting back, yet Appellant kept beating him all over his body. Ms. Kreiser testified that Appellant was on top of Mourey, Mourey crashed through a glass coffee table, and she saw Appellant ram Mourey with his shoulder causing Mourey's head go through the wall. As a result of this attack, Mourey sustained severe injuries, while Appellant and Mader were not significantly harmed. We conclude that this evidence was more than sufficient to demonstrate that Appellant inexcusably continued the assault against Mourey, and that he used more force than was

reasonably necessary to protect himself from Mourey's purported attack. ***Commonwealth v. Burns***, 765 A.2d 1144, 1149 (Pa. Super. 2000).

Finally, the evidence proved, beyond a reasonable doubt, that because the location of the assault was not Appellant's home or place of work, he had a duty to retreat, and he could have done so with complete safety. ***See*** 18 Pa.C.S. § 505(b)(2)(ii). While Appellant baldly contends that he "could not [have] retreat[ed] safely in the heat of the moment[,]" the record belies this claim. Again, according to Mourey's testimony, he opened the door with a knife in hand, but was not raising that weapon or coming out of the door toward Appellant. Ms. Kreiser testified that when Mourey opened the door, Appellant was at the bottom of the steps leading up to the door and, from that position, Appellant could have fled the garage behind Ms. Kreiser. According to both Mourey and Ms. Kreiser, Appellant rushed at Mourey and shoved him against the wall, rather than fleeing. From this testimony, it was appropriate for the jury to conclude, beyond a reasonable doubt, that Appellant could have safely retreated from the garage to escape Mourey's purported attack.

In sum, we conclude that the Commonwealth presented sufficient evidence to disprove Appellant's claim of self-defense. Namely, the Commonwealth established that Appellant provoked the attack, continued the attack beyond that which was necessary to defend himself, and/or had a duty to retreat and could have safely done so. Therefore, Appellant's convictions for aggravated and simple assault must be upheld. ***See***

*Coronett*, 455 A.2d at 1228 ("The conviction must be upheld if, accepting as true all the evidence which could properly have been the basis for the verdict, the finder of fact could reasonably find that [the] appellant's claim of self-defense had been disproved beyond a reasonable doubt.").

Appellant next asserts that the jury's verdict was contrary to the weight of the evidence.

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Houser*, 18 A.3d 1128, 1135-1136 (Pa. 2011) (citations and internal quotation marks omitted).

In support of his challenge to the weight of the evidence, Appellant maintains that he, Ms. Kreiser, and Mader "all told similar stories that indicated that the catalyst of the altercation was Mourey's possession of a knife and the immediate danger it posed." Appellant's Brief at 34. Appellant avers that "the jury's verdict goes against the weight of the evidence because the **only** person's testimony that truly supported findings of

aggravated and simple assault was that of Mourey." ***Id.*** (emphasis in original).

In rejecting Appellant's weight-of-the-evidence claim, the trial court reasoned:

> In Appellant's case, the jury heard the testimony of all four individuals present during the altercation that resulted in the victim's injuries. The jury was free to believe or reject the testimony of any or all witnesses. The jury was properly instructed on the elements of each offense, and the elements of self-defense. After deliberation, the jury, having found that all of the elements of simple and aggravated assault were present and that the Commonwealth disproved the claim of self-defense, returned a guilty verdict as to both assault charges. Considering the wealth of evidence that was presented at trial (much of which was referenced earlier in this memorandum), Appellant's guilty verdict may not be disturbed as it was not so against the weight of the evidence such that it would shock one's sense of justice.

Trial Court Opinion, 1/8/15, at 6-7.

Based on our thorough discussion of the evidence presented at Appellant's trial, we ascertain no abuse of discretion in the trial court's denying Appellant's challenge to the weight of the evidence. The jury was free to reject the testimony of Appellant, Ms. Kreiser, and Mader, and to credit Mourey's version of the attack. Therefore, Appellant's claim that the verdict was contrary to the weight of the evidence is meritless.

Finally, Appellant presents a challenge to his sentence, claiming that his separate sentences for aggravated and simple assault are illegal, as

those crimes merge for sentencing purposes.[2]   Appellant relies on

**Commonwealth v. Murphy**, 462 A.2d 853 (Pa. Super. 1983), where this

Court reiterated:

> "Applying the doctrine of merger, we find that simple assault merges into both aggravated assault and recklessly endangering another person. Simple assault is defined as conduct by which one 'attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another.' 18 Pa.C.S. § 2701(a)(1). The elements of this offense are necessarily included in the crime of aggravated assault, which is defined as conduct by which one 'attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life,' 18 Pa.C.S. § 2702(a)(1)...."

**Commonwealth v. Murphy**, 462 A.2d 853, 855 (Pa. Super. 1983) (quoting

**Commonwealth v. Cavanaugh**, 420 A.2d 674, 676 (Pa. Super. 1980)).

Based on **Cavanaugh** and **Murphy**, we agree with Appellant that his

separate sentences for aggravated assault and simple assault are illegal.  We

also note that the Commonwealth concedes this point, as well.[3]   **See**

_____

[2] While Appellant did not raise this claim before the trial court, "[a] claim that crimes should have merged for sentencing purposes raises a challenge to the legality of the sentence." **Commonwealth v. Nero**, 58 A.3d 802, 806 (Pa. Super. 2012).  "A challenge to the legality of the sentence may be raised as a matter of right, is non-waivable, and may be entertained [as] long as the reviewing court has jurisdiction." **Commonwealth v. Robinson**, 931 A.2d 15, 19-20 (Pa. Super. 2007) (_en banc_).

[3] We acknowledge that, "where 'the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime, then the actor will be guilty of multiple crimes which do not merge for sentencing purposes.'" **Commonwealth v. Gatling**, 807 A.2d 890, 896 (Pa. 2002) (quoting **Commonwealth v. Weakland**, 555 A.2d 1228, 1233 (Pa. 1989), _abrogated on unrelated grounds by_
*(Footnote Continued Next Page)*

Commonwealth's Brief at 9. Therefore, we vacate Appellant's judgment of sentence and remand for resentencing.

Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/28/2015

_____
*(Footnote Continued)*

***Commonwealth v. Anderson***, 650 A.2d 20, 22 (Pa. 1994) (holding that "in all criminal cases, the same facts may support multiple convictions and separate sentences for each conviction except in cases where the offenses are greater and lesser included offenses")). Here, the Commonwealth does not argue that Appellant's convictions were premised on different criminal acts. Additionally, the criminal information set forth an identical factual predicate for both assault charges. Accordingly, the record supports a conclusion that Appellant's convictions were not based on separate criminal acts permitting individual sentences for each assault offense.