J-A09033-21

2021 PA Super 120

| | | |
|---|---|---|
| IN RE: ESTATE OF GREGG A. SCHWOTZER, DECEASED CROSSGATES, INC., A PENNSYLVANIA BUINESS CORPORATION, CROSSGATES MANAGEMENT, INC., A PENNSYLVANIA BUSINESS CORPORATION, ARTHUR C. SCHWOTZER, AN INDIVIDUAL, AND RYAN A. SCHWOTZER, AN INDIVIDUAL | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br>No. 1698 WDA 2019 |
| v. | : : : : | |
| ESTATE OF GREGG A. SCHWOTZER, DECEASED, AND PAMELA Z. SCHWOTZER, INDIVIDUALLY AND IN HER CAPACITY AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GREGG A. SCHWOTZER, DECEASED | : : : : : : : : : | |
| APPEAL OF:  CROSSGATES, INC., A PENNSYLVANIA BUINESS CORPORATION, CROSSGATES MANAGEMENT, INC., A PENNSYLVANIA BUSINESS CORPORATION, ARTHUR C. SCHWOTZER, AN INDIVIDUAL | : : : : : : : | |

Appeal from the Order Entered October 28, 2019
In the Court of Common Pleas of Washington County Orphans' Court at
No(s):  63-14-1029

| | | |
|---|---|---|
| IN RE: ESTATE OF GREGG A. SCHWOTZER, DECEASED CROSSGATES, INC., A PENNSYLVANIA BUINESS CORPORATION, CROSSGATES MANAGEMENT, INC., A PENNSYLVANIA BUSINESS | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

| | | |
|---|---|---|
| CORPORATION, ARTHUR C. SCHWOTZER, AN INDIVIDUAL, AND RYAN A. SCHWOTZER, AN INDIVIDUAL | : : : : : : : | No. 1699 WDA 2019 |
| v. | : : : | |
| ESTATE OF GREGG A. SCHWOTZER, DECEASED, AND PAMELA Z. SCHWOTZER, INDIVIDUALLY AND IN HER CAPACITY AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GREGG A. SCHWOTZER, DECEASED | : : : : : : : : : : | |
| APPEAL OF: RYAN A. SCHWOTZER, AN INDIVIDUAL | : : | |

Appeal from the Order Entered October 28, 2019
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): 63-14-1029

BEFORE: STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:                    **FILED: JUNE 11, 2021**

This consolidated appeal concerns a dispute over the purchase price of

shares in the companies, Crossgates, Inc. (CI) and Crossgates Management,

Inc. (CMI). The shares in question are held by the Estate of Gregg A.

Schwotzer (the decedent), who passed away in 2014. The decedent's father

(Arthur C. Schwotzer), the decedent's nephew (Ryan A. Schwotzer), CI and

CMI (collectively, the Petitioners) have sought to enforce the provisions of the

_____

[*] Retired Senior Judge assigned to the Superior Court.

CI and CMI Shareholder Agreements, which give CI and CMI the right to purchase the decedent's shares at "book value" upon his death. The Appellees (referred to collectively here as the Estate)[1] have responded that those Shareholder Agreements were terminated by the decedent and Arthur C. Schwotzer prior to the decedent's death.

After a non-jury trial, the Court of Common Pleas of Washington County Orphans' Court (the orphans' court) denied the Petitioners' requested relief and they timely appealed.[2] The Petitioners now contend that the orphans' court misinterpreted the Shareholder Agreements, misapplied the law as to the parties' respective burdens of proof, relied on evidence not of record, and excluded admissible testimony. For the reasons that follow, we affirm the denial of the Petitioners' requested relief as to the Estate's shares in CI, but reverse the denial of relief as to the Estate's shares in CMI.

## I.

CI and CMI are real estate companies that have a combined market value of about 15 million dollars. When the decedent passed away in 2014,

---

[1] The Appellees in both consolidated appeals are the Estate of the decedent and the surviving spouse of the decedent, Pamela Z. Schwotzer, who appears both in her individual capacity and as the personal representative of the Estate.

[2] By stipulation of the parties, the two appeals listed in the above caption have been consolidated for the purposes of briefing and argument. *See* Pa.R.A.P. 513.

he owned about 45% of CI and 54% of CMI. Prior to his death, he had long served as the director and president of the two companies.

In 1994, the decedent's ownership interest and role in the two companies was negotiated with his father, Arthur C. Schwotzer. As the sole shareholders of CI and CMI at that time, they executed two Shareholder Agreements which, in pertinent part, gave CI and CMI the right to buy the decedent's stock at book value upon his death. The respective provisions of the CI and CMI Shareholder Agreements are identical for present purposes.

In 2012, Arthur C. Schwotzer transferred a portion of his shares in CMI to his grandson, Ryan A. Schwotzer, giving the latter party a 36% ownership interest in the company. The decedent retained his 54% stake and Arthur C. Schwotzer kept 10%. Ryan A. Schwotzer received a stock certificate which incorporated by reference the 1994 CMI Shareholder Agreement, making Ryan A. Schwotzer subject to the Shareholder Agreement's transfer restrictions. CMI's Bylaws also provided that the CMI Shareholder Agreement would govern as to any subsequent stock transfers. Section 4.03 of the Shareholder Agreements required the written consent of **all** parties before the Shareholder Agreements could be amended or terminated.

When the decedent became very ill in early 2014, his attorney prepared two documents, each purporting to revoke the 1994 CI and CMI Shareholder Agreements. Arthur C. Schwotzer and the decedent executed the Revocation of the CMI Agreement. The Revocation of the CI Agreement was executed by

the decedent, Arthur C. Schwotzer and Jason Fusco, a board member of CI. Ryan A. Schwotzer did not personally execute these Revocations but did serve as a witness to their execution. He has denied that he knew about or consented to what the Revocations were intended to accomplish at the time they were executed.

After the decedent's death, his shares in CI and CMI passed directly to the Estate. Pursuant to the Shareholder Agreements, CI and CMI attempted to purchase the shares at book value, but the Estate claimed that the companies' right to do so had been terminated by the Revocations. The total difference between the book value and market price of the shares in the two companies is about 12 million dollars. The Petitioners and the Estate were unable to negotiate a price and the shares remained with the Estate.

About two years after the decedent's death, on December 28, 2016, CI, CMI and Arthur C. Schwotzer filed a petition for citation to show cause why the CI and CMI Shareholder Agreements should not be enforced.[3] In an amended petition, Ryan A. Schwotzer was added as a Petitioner, and their claims were finalized on July 27, 2017, with the filing of their second amended petition (the petition).

The petition included demands for a decree rescinding the Revocations and a declaratory judgment that the Revocations have no legal effect. The

_____

[3] The petition was filed pursuant to 20 Pa.C.S. § 764.

- 5 -

Petitioners also alleged in a breach of contract count that the Revocations violated the Shareholder Agreements. As a remedy, the Petitioners sought a mandatory injunction requiring the Estate to recognize the Petitioners' right to buy the decedent's shares at book value.

The Estate filed a motion *in limine* to preclude the testimony of witnesses regarding any matter prior to the decedent's death if such witnesses' interests could conflict with those of the Estate. **See** 42 Pa.C.S. § 5930 (codifying the "Dead Man's Rule," which disqualifies testimony of surviving witnesses with interests adverse to a deceased party). The Estate asserted that the interests of Arthur C. Schwotzer, Ryan A. Schwotzer and the two corporate entities were adverse to those of the Estate, barring their testimony at trial. Similarly, the Estate sought to bar the testimony of Jason Fusco, despite that he had since left his positions as a corporate officer of CI and CMI. The orphans' court granted this motion, and none of those witnesses were allowed to testify.

At the bench trial, no testimonial evidence was presented by either side about the Shareholder Agreements or the Revocations. The testimony was instead largely limited to an accountant's valuations of the decedent's shares

in CI and CMI at the time of his death. **See** Trial Transcript, 12/17/2018, at pp. 38-42.[4]

The Petitioners argued at the conclusion of the trial that the Estate had the initial burden of proving the Revocations' validity but had failed to do so.[5] The orphans' court denied the motion to shift the burden of proof and both sides then filed proposed findings of fact and conclusions of law.

Ultimately, the orphans' court denied the petition to enforce the Shareholder Agreements, instead giving effect to the Revocations. First, the orphans' court found that the Petitioners were not entitled to relief as a matter of law because they failed to act promptly after the decedent's death to void the Revocations, waiting two years to petition for enforcement of the Shareholder Agreements.

Moreover, the orphans' court interpreted the CMI Shareholder Agreement as having only two parties – Arthur C. Schwotzer and the decedent – excluding Ryan A. Schwotzer as a party whose written consent was needed to revoke the CMI Shareholder Agreement. The orphans' court found

_____

[4] An accountant testified that the total book value of CI was $832,482, and the total book value of CMI was $4,344,175. The book value of the decedent's shares in CI was $374,617, and his shares in CMI had a book value of $2,350,000. The market value of the decedent's shares in CI was $10,120,542, and the market value of his shares in CMI was $4,994,347.

[5] The minimal evidence presented by the Estate and the Petitioners made the burden of proof issue critical to the trial's outcome.

alternatively that Ryan A. Schwotzer had consented to the CI and CMI Revocations because he had signed them as a witness.

The orphans' court denied the Petitioners' claim that the Revocations were presumptively void as self-interested transactions by the decedent. In doing so, the orphans' court cited an allegation in the petition that the Revocations were intended to benefit Ryan A. Schwotzer.

The Petitioners timely appealed, and Ryan A. Schwotzer filed a separate appeal which has been consolidated. They contend that the orphans' court erred in several respects:

- By finding the Revocations valid based on unsupported factual determinations, including the Petitioners' allegation as to the Revocations' purpose;

- By finding that the Petitioners did not timely file their petition to enforce the CI and CMI Shareholder Agreements;

- By finding that Ryan A. Schwotzer was not a party to the CMI Shareholder Agreement whose consent was needed to give the CMI Revocation effect, and by finding alternatively that he consented to both Revocations by witnessing their execution;

- By failing to shift the burden of proof to the Estate as to whether the Revocations were void or voidable;

- By finding that the Revocations are presumptively valid because they benefit all the parties; and

- By excluding the testimony of James Fusco under the Dead Man's Act.

**II.**

**A.**

First, we consider the Petitioners' claim that the orphans' court erred in relying on the allegation in their petition that the "essential purpose" of the CI and CMI Revocations was to facilitate the transfer of the decedent's shares to Ryan A. Schwotzer without restriction. ***See*** Second Amended Petition, 7/27/2017, at Paragraph 55.[6] The orphans' court construed this allegation as a judicial admission that the Revocations were executed to benefit all parties. This was despite that the Petitioners' allegation was disputed by the Estate and not introduced into evidence, as is required for a pleading to become a judicial admission. ***See generally Gen. Equip Mfrs. v. Westfield Ins. Co.***, 635 A.2d 173, 181 (Pa. Super. 1993).

Without going so far as to concede the point, the Estate responds that any error in construing the allegation as an admission would be harmless because it was immaterial to the final adjudication of the orphans' court. ***See*** Appellees' Brief, at 29-32; ***see also Commonwealth v. Bunch***, 477 A.2d 1372, 1376 (Pa. Super. 1984) (unsupported finding of fact subject to harmless error analysis).

---

[6] Our review is limited to assessing whether the orphans' court's findings of fact are supported by competent evidence and whether the orphans' court committed an error of law. See ***Szymanski v. Dotey***, 52 A.3d 289, 292 (Pa. Super. 2012).

We agree with the Petitioners that the orphans' court made an unsupported finding of fact. However, we also agree with the Estate that the orphans' court did not rely on it when ruling that the Revocations were presumptively valid. As stated by the orphans' court at a post-trial hearing, the purpose of the Revocations was not relevant as to the parties' respective burdens of proof or any other issue in dispute. *See* Post-Trial Application for Stay, 1/10/2020, at p. 25 ("I don't have to make a determination of what the purpose was, and that wasn't my point to refute the argument about why [the Revocations were executed.]"). This erroneous evidentiary finding was, therefore, harmless.

**B.**

The Petitioners next contend that the trial court erred in finding that they are barred from challenging the Revocations because they failed to act promptly. The orphans' court did not specify whether its ruling in this regard was predicated on common law or contract principles, so we will review whether either theory justifies the dismissal of the Petitioners' claims.

Generally, at common law, a transaction may be rescinded as long as the rescission can return the parties to the *status quo*. *See Umbelina v. Adams*, 34 A.3d 151, 157 (Pa. Super. 2011). A claim of rescission "must also be pursued with sufficient promptitude, including prompt notification to the breaching party." *Gamesa Energy USA, LLC v. Ten Penn Center Associates, L.P.*, 217 A.3d 1227, 1241 (Pa. 2019); *see also Fichera v.*

***Gording***, 227 A.2d 642, 643–44 (Pa. 1967) ("[T]he rescission should be made while the parties can still be restored to their original positions. Failure to rescind within a reasonable time is evidence, and may be conclusive evidence, of an election to affirm the contract.").

The deadlines of a contract are controlling, but a party who prevents another party's performance under a contract creates an excuse for nonperformance. ***See Liddle v. Scholze***, 768 A.2d 1183, 1185 (Pa. Super. 2001). "Where an agreement contains no express provision, we determine the parties' intention in that regard from the surrounding circumstances and by application of a reasonable construction of the agreement as a whole." ***Id***. at 1185.

Here, the CI and CMI Shareholder Agreements both provide in Section 1.04(c) that the companies have 90 days to exercise the right to purchase the decedent's stock from the date of a "mandatory sale event," *i.e.*, the death or incapacity of the decedent. Section 1.06 of the Shareholders Agreements required that where this right of first refusal is exercised, the purchase of stock must be consummated no later than the first business day after the 90th day in which the purchase rights arose.

The Petitioners' action was brought more than two years after the decedent's death, but the record is silent as to whether the Petitioners comported or at least attempted to comport with the timing requirements of their purchase rights under the Shareholder Agreements. All that can be

gleaned from the record is that after the decedent's death, the Petitioners and the Estate tried to negotiate a purchase price but were unsuccessful, in part because the Estate did not recognize the Shareholder Agreements as being in force.

This dispute made it impossible for the Petitioners to have purchased the decedent's stock within the time constraints imposed by the Shareholder Agreements. The Petitioners cannot be bound by the 90-day purchase window and barred from asserting their rights under the Shareholder Agreements because the Estate refused to sell the stock at book value within that period.[7]

Moreover, the record does not establish that the Petitioners failed to commence their action within a reasonable time. The Estate makes no claim that it suffered prejudice due to the timing of the Petitioners' suit. Nor does the Estate claim that it cannot be restored to its original position if the Revocations are rescinded.

For these reasons, neither legal theory – lack of prompt action in common law or failure to purchase the stock within the contractual deadlines – is supported by the record. Accordingly, we find that the orphans' court

_____

[7] The Shareholder Agreements do not account for this eventuality or otherwise impose alternative deadlines for the purchase of stock at book value when the parties have an ongoing dispute over whether the right of first refusal has been rescinded. A reasonable construction of the Shareholder Agreements is that the period to exercise the right of first refusal is tolled pending the outcome of such a dispute and its ensuing litigation.

erred in ruling that the Petitioners are time-barred from disputing the Revocations of the Shareholder Agreements.

## III.

## A.

Because Ryan A. Schwotzer owned shares in CMI but not CI, we must separately evaluate the validity of the CMI and CI Revocations with that fact in mind. First, we will consider the Petitioners' claim that Ryan A. Schwotzer's ownership of CMI shares made him a party to the CMI Shareholder Agreement, preventing the Revocation of that Shareholder Agreement from taking effect without his written consent.[8]

In 2012, Ryan A. Schwotzer obtained from Arthur C. Schwotzer about 36% percent of all CMI shares. Importantly, his duly executed stock certificate includes a transfer restriction. It states that the transfer of CMI shares from Arthur C. Schwotzer to Ryan A. Schwotzer would be "subject to restrictions on transferability imposed by a Shareholders' Agreement effective as of August 19, 1994 (which is incorporated by reference), which gives the company and the shareholders of the company an option to purchase such shares in certain instances."

_____

[8] The orphans' court ruled as a matter of law that the Revocations of the CI and CMI Shareholder Agreements were valid, and we review such contract interpretations under a *de novo* standard. *See Stamerro v. Stamerro*, 889 A.2d 1251, 1257-58 (Pa. Super. 2005). We may consider the entire record in making our decision. *See id*.

- 13 -

The Estate and the Petitioners differ as to how the above language should be construed. The Petitioners argue that by virtue of the stock transfer and the certificate's incorporation by reference of the CMI Shareholder Agreement, Ryan A. Schwotzer became a "shareholder" for the purposes of that Shareholder Agreement and, therefore, a "party" to it. As such, pursuant to Section 4.03 of the CMI Shareholder Agreement, Ryan A. Schwotzer's written consent would be needed to modify or terminate any of the Shareholder Agreement's terms, including CMI's right to purchase the decedent's shares at book value upon his death.

The Estate responds that while Ryan A. Schwotzer owns CMI shares, only the decedent and Arthur C. Schwotzer were contemplated in the CMI Shareholder Agreement as being the parties whose written consent would be needed to revoke it. In the Estate's view, the transfer of shares to Ryan A. Schwotzer did not make him a "party" to the CMI Shareholder Agreement, so his written consent was not needed to amend or terminate any of the Shareholder Agreement's provisions.

To resolve whether Ryan A. Schwotzer became a "party" to the CMI Shareholder Agreement when he received his shares, we must examine the language of the CMI Shareholder Agreement and the CMI Bylaws. **See** 15 Pa.C.S. § 1529(b) ("A restriction [on a stock transfer] may be amended by the vote or consent, and otherwise in the manner, provided in the bylaws or

- 14 -

agreement for amending the restriction or, in the absence of such a provision, as provided for amending the bylaws or agreement generally.").

"[I]n construing a contract the intention of the parties governs and that intention must be ascertained from the entire instrument[.]" *In re Mather's Est.*, 189 A.2d 586, 589 (Pa. 1963).  This examination will take "into consideration the surrounding circumstances, the situation of the parties when the contract was made and the objects they apparently had in view and the nature of the subject matter." *Id*.

Here, the first sentence of the 1994 CMI Shareholder Agreement states that it is "by and among" Arthur C. Schwotzer and the decedent.  The CMI Shareholder Agreement often employs phrases such as "either party" or "each shareholder," indicating that only those two original shareholders were identified as parties to the Shareholder Agreement as of the time it was executed in 1994.

However, the CMI Shareholder Agreement contains more specific provisions as to its intended scope regarding *future* shareholders.  **See Nitardy v. Chabot**, 195 A.3d 941, 952 (Pa. Super. 2018) ("[W]hen interpreting a contract, the specific controls over the general.").

Section 4.01 states unambiguously and without caveat that the Shareholder Agreement "shall be binding upon and **shall inure to the benefit of the parties hereto <u>and their respective heirs, personal representatives, beneficiaries, successors and assigns</u>**."  (Emphasis

- 15 -

added).  Moreover, Article XI of CMI's Bylaws provides that the amendment or repeal of "any stock restriction agreement . . . must receive the approval of all of the **then** shareholders of the corporation."  (Emphasis added).

Taken together, the clear import of these provisions is that shareholders other than the decedent and Arthur C. Schwotzer were contemplated as future parties to the CMI Shareholder Agreement.  The Shareholder Agreement's restriction on the sale of stock was a benefit which could not be rescinded without the written consent of all extant, or "then," shareholders of CMI.

The requirement of unanimous written consent by CMI shareholders to revoke the Shareholder Agreement is both an obligation and a benefit which passed to Ryan A. Schwotzer upon the transfer of CMI shares to him from Arthur C. Schwotzer.  As the recipient of Arthur C. Schwotzer's shares, Ryan A. Schwotzer would have not just the same obligations of the two original parties under the Shareholder Agreement, but also the right to *enforce* the benefits inuring to him as a shareholder.  CMI's right to purchase the decedent's shares could not be rescinded without written consent of all parties to the CMI Shareholder Agreement, and this included Ryan A. Schwotzer.

**B.**

Our conclusion that Ryan A. Schwotzer was a party to the CMI Shareholder Agreement brings us next to the Petitioners' claim that the orphans' court erred in finding that Ryan A. Schwotzer implicitly consented to the CMI Revocation by witnessing its execution.  Again, since Ryan A.

Schwotzer was a party to the CMI Shareholder Agreement, Section 4.03 of the Shareholder Agreement required his consent to be in *writing*. He could not give his own written consent by serving as a witness to the written consent of *another party*.

Further, the act of witnessing another party's execution of a document is purely ministerial; the witness is not required to review, much less approve of, the document's contents. The role of a witness in such situations is merely to verify the identity and signature of the persons who are executing the document. **See generally** 57 Pa.C.S. §§ 301-331 (Revised Uniform Law on Notarial Acts). Serving in that limited capacity does not make Ryan A. Schwotzer bound by the Revocations' terms.

Accordingly, we reverse the orphans' court's denial of the Petitioners' request to enforce their right to purchase the Estate's shares in CMI at book value. We stress, however, that because Ryan A. Schwotzer owns no shares in CI, this analysis only applies as to the validity of the CMI Shareholder Agreement and the voidness of the CMI Revocation.

## IV.

## A.

We now turn to the Petitioners' claim that the orphans' court erred in not requiring the Estate to assume the initial burden of proving that the CI Revocation is valid.

The available facts relevant to this issue are scant. At the time of this Revocation, the only CI shareholders were the decedent and Arthur C. Schwotzer. The CI Board of Directors was composed of the decedent, Arthur C. Schwotzer and Jason Fusco. All three board members executed the Revocation of the CI Shareholder Agreement in 2014, doing so by unanimous consent.

It is well established that any act approved by a company's board of directors is presumed valid under the statutory "business judgment rule," which provides as follows:

> (d) Presumption. – Absent breach of fiduciary duty, lack of good faith or self-dealing, any act as the board of directors, a committee of the board or an individual director shall be presumed to be in the best interests of the corporation.

15 Pa.C.S. § 1715(d).

By operation of Section 1715, the Revocation executed by the CI Board of Directors was presumed to be in the best interest of CI, and the Petitioners and not the Estate had the initial burden of proving that the CI Revocation resulted from a "breach of fiduciary duty, lack of good faith[,] or self-dealing" on the part of the decedent.

It is undisputed that the decedent and Arthur C. Schwotzer made up all of CI's shareholders. They both decided to revoke the CI Shareholder Agreement with full knowledge of the terms of the CI Shareholder Agreement and the Revocation. There is no evidence that the decedent operated in bad

faith, breached a fiduciary duty or engaged in self-dealing. Thus, the Petitioners have not met their burden of proof under Section 1715.

**B.**

The Petitioners have sought to avoid their initial burden under Section 1715 by asserting that the decedent's fiduciary duties as a board member of CI amounted to a "confidential relationship"[9] with Arthur C. Schwotzer. They rely on the general proposition that "transactions between persons occupying a confidential relationship are *prima facie* voidable, and the party seeking to benefit from such a transaction has the burden of proving that the transfer was indeed fair, conscientious and beyond the reach of suspicion." *In re Estate of Mihm*, 497 A.2d 612, 615-16 (Pa. Super. 1985) (quoting *Frowen v. Blank*, 425 A.2d 412, 416 (Pa. 1981)).

We decline to find that the CI Revocation was presumptively voidable on the grounds of a confidential relationship between the decedent and Arthur C. Schwotzer. Under 15 Pa.C.S. § 1728, no such presumption applies solely because the directors of a corporation have authorized a corporate act that might benefit them as shareholders:

> A contract or transaction between a business corporation and one or more of its directors or officers or between a business corporation and another domestic or foreign corporation for profit or not for profit, partnership, joint venture, trust or other enterprise in which one or more of its directors or officers are

---

[9] "The essence of such a relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other." *In re Estate of Scott*, 316 A.2d 883, 885 (Pa. 1974).

directors or officers or have a financial or other interest, shall not be void or voidable solely for that reason, or solely because the director or officer is present at or participates in the meeting of the board of directors that authorizes the contract or transaction, or solely because his or their votes are counted for that purpose, if:

(1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors and the board authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors even though the disinterested directors are less than a quorum;

(2) the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon and the contract or transaction is specifically approved in good faith by vote of those shareholders; or

(3) the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board of directors or the shareholders.

15 Pa.C.S. § 1728.

In this case, the material terms of the Revocation were fully disclosed to all three members of CI's Board of Directors – the decedent, Arthur C. Schwotzer and Jason Fusco. There is no allegation that the decedent defrauded other shareholders or directors; nor was it ever alleged that Arthur C. Schwotzer was the victim of undue influence when he agreed to the Revocation. Accordingly, for the reasons stated in Subsections 1728(1) and 1728(2) above, the presumption of voidability does not apply to the CI Revocation.

Further, the presumption does not apply for the reasons stated in Subsection 1728(3). As the orphans' court explained, the CI Revocation was not a self-interested transaction by the decedent, but rather a mutual decision reached between him and Arthur C. Schwotzer:

> Upon execution of the revocations, all shares owned by the Decedent and Arthur Schwotzer in CI . . . became unencumbered and unrestricted. There was no evidence that the transaction was designed solely for the benefit of the Decedent.

Orphans' Court Opinion, 9/30/2020, at 30.

While one effect of the Revocation is that CI cannot buy the decedent's shares at book value, we find no evidence in the record showing that this arrangement was unfair as to CI when it was unanimously approved and authorized by CI's Board of Directors and all of its shareholders.

Both Sections 1715 and 1728 put the initial burden on the Petitioners to prove that the CI Revocation is voidable. Because that burden has not been met, the orphans' court did not err in finding the CI Revocation to be valid.

**C.**

Briefly, with respect to the exclusion of Jason Fusco's testimony, we find that no appellate relief is due. Even if the orphans' court erred in excluding his testimony, it would only be reversible error if it was "harmful or prejudicial to the complaining party." ***Ettinger v. Triangle–Pacific Corp.,*** 799 A.2d 95, 110 (Pa. Super. 2002) (quoting ***Turney Media Fuel, Inc. v. Toll Bros., Inc.***, 725 A.2d 836, 839 (Pa. Super. 1999)). The record contains no proffer as to what Fusco would have testified to and how the absence of his testimony could

- 21 -

have prejudiced the Petitioners. Any error in applying the Dead Man's Rule to Fusco's testimony is, therefore, harmless.

Accordingly, for the foregoing reasons, we affirm the orphans' court's decision not to rescind the Revocation of the CI Shareholder Agreement but reverse its finding that the CMI Revocation is valid.

Order reversed in part; affirmed in part. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 06/11/2021